GUNTER & COOKE, INC., Plaintiff,

v.

SOUTHERN ELECTRIC SERVICE CO., Inc., Defendant.

No. C–13–D–64.

United States District Court
M. D. North Carolina,
Durham Division.

April 22, 1966.

Channing L. Richards, of Richards, & Shefte, Charlotte, N. C., and William R. Winders, of Nye, Winders & Mitchell, Durham, N. C., for plaintiff.

Thornton H. Brooks, of McLendon, Brim, Holderness & Brooks, Greensboro, N. C., and William D. Hall, of Hall, Pollock & VandeSande, Washington, D. C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

GORDON, District Judge.

This is a suit instituted seeking, along with other relief, to enjoin infringement of patent No. 3,006,035, issued October 31, 1961, to Josef K. Gunter, of Durham, North Carolina, on application filed September 19, 1960, which patent is owned by the plaintiff, Gunter & Cooke, Inc., by assignment. The patent in suit is commonly referred to as the Gunter patent and discloses a drive (herein referred to as the Gunter drive) for textile carding machines, employing an electric motor mounted on the carding machine. The driving pulley of the electric motor is very small in diameter as compared with the driven pulley on the card machine.[1] The motor pulley or driving pulley is characterized by transverse ribs or teeth which mesh with the transverse ribs or teeth on the inner surface of the belt used to transmit the force of the motor pulley to the card pulley. On the contrary, the pulley on the card machine is a smooth surface pulley. The Gunter drive, the evidence establishes, is intended for operation with a comparatively wide timing belt and on short center distances between the driving and driven pulleys. A timing belt is a belt featured by transverse ribs or teeth on the inner side which mesh with the ribs or teeth on the pulley, and in the Gunter drive the teeth on the belt mesh with teeth on the driving pulley only so as to make a positive connection between the driving pulley and the belt. Therefore, slippage on the driving or motor pulley is totally avoided.

The complaint, in addition to asking for an adjudication that the patent is valid and damages for infringement and injunction against further infringement, additionally prays for an accounting by defendant for profits by reason of the misappropriation of the subject matter of the patent prior to the issuance thereof. The plaintiff in its brief states very candidly that after reviewing the record, there is no substantial evidence of market activity by the defendant prior to the issuance of the patent in suit with respect to the devices accused of infringement, and therefore the plaintiff waives any and all claims to damages by reason of misappropriation. The defendant denies both infringement and misappropriation, and pleads in addition that the patent is invalid in that it is, among other reasons, anticipated in the prior art, not sufficiently definite and is lacking in invention. Further, the defendant in its answer avers that it does not "reside" in this District and has not committed an act of infringement in this District, and therefore venue is improper under 28 U.S.C.A. § 1400(b).

It is stipulated in the initial pre-trial order that the issue of liability would first be determined by the Court, and if any party be found liable, the matter of the damage would then be referred to a master for determination. Hence the issues are the following: (1) venue; (2) validity and (3) infringement.

Having now carefully considered all of the counsels' proposals, arguments and contentions, as well as the testimony, pleadings, stipulations, briefs and exhibits submitted, and the reasonable inferences to be drawn therefrom, the Court pursuant to Rule 52 of the Federal Rules of Civil Procedure makes its Findings of Fact and Conclusions of Law as follows:

### FINDINGS OF FACT

1. The complaint, filed in this Court on February 4, 1964, charges the defendant and T. B. Wood's Sons Company, of Chambersburg, Pennsylvania, with infringement, inducing infringement and contributory infringement of United States Letters Patent No. 3,006,035. The defendant, Southern Electric Service Co., Inc., is a corporation organized and existing under the laws of the State of

---

1. Copy of patent No. 3,006,035 (Plaintiff's Exhibit 1) states in Column 1, line 24, that "the driven pulley of the machine being many times the diameter of the driving pulley on the motor."

North Carolina with a principal place of business in Charlotte, North Carolina, and with a regular and established place of business in the City of Greensboro, North Carolina, within this District, and is a distributor for the T. B. Wood's Sons Company. The plaintiff is a corporation organized and existing under the laws of the State of North Carolina with a principal place of business in Durham, North Carolina.

2. On February 26, 1964, both T. B. Wood's Sons Company and the defendant, Southern Electric Service Co., Inc., filed answers and moved to sever and transfer the action as to T. B. Wood's Sons Company to the Middle District of Pennsylvania, and to stay the action in this Court as to the defendant, Southern Electric Service Company, Inc.

3. After discovery procedures were initiated, the plaintiff conceded that venue was improper as to T. B. Wood's Sons Company, and an order was entered dismissing the action without prejudice as to T. B. Wood's Sons Company and denying the motion challenging venue as to the defendant, Southern Electric Service Company, Inc., subject to reconsideration of the motion should such appear warranted after development of the record. Therefore, Southern Electric Service Company, Inc., stands as the sole defendant in this litigation.

4. All parties are properly before the Court, and the Court has jurisdiction of the parties and the subject matter, but an issue remains of whether there occurred an "act of infringement" in this District to support venue.

5. On September 10, 1962, a purchase order was issued by the Cone Mills Corporation to the defendant for "15 Timing Flat Wood's Drives—2 H.P. Motor—1160 R.P.M.—550 Volts—manual starter with reversing switch inside—the above drives for Whitin cards." On the strength of a telephone conversation with officials of Cone Mills Corporation relative to the fifteen machines, the defendant on September 7, 1962, issued its order to the T. B. Wood's Sons Company, which order read thusly: "15 T.B. Wood's Timing to Flat Card Drives, (left hand drive) for Whiten 40″ Card, complete with 2 H.P. G.E. motor, 1160 R.P.M., pancake type, 550 volts, 3 phase, 60 cycle, cylinder speed 165 R.P.M." On October 18, 1962, T. B. Wood's Sons Company shipped from its plant in Pennsylvania the fifteen units as ordered but unassembled to the Tabardrey Plant of Cone Mills Corporation, Haw River, North Carolina. The timing drive components shipped to the Tabardrey Plant were adapted to be assembled and installed in accordance with T. B. Wood's Sons Company drawing No. 20045–B–1, with the exception that the units as shipped did not include the large driven pulley reflected on drawing No. 20045–B–1.[2] Prior to the filing of the complaint in this action, the card drives supplied, pursuant to the order, were installed at the Tabardrey Plant, within this District, in the form shown by drawing No. 20045–B–1 and operated and were in use at the plant at the time of the hearing of this action.

6. Prior to the year 1950, cotton carding machines with few exceptions were driven from an overhead line shaft, employing a flat belt to transmit the power from the flat pulley on the overhead line shaft to the flat pulley on the card machine. Usually one overhead line shaft would be used to furnish power to a number of machines in the line, with a belt running down to the respective machines. The motor to furnish the power for the overhead line shaft customarily would be placed at the end of a line of machines.[3]

7. The Gunter patent describes an individual drive arrangement, i. e., a separate drive unit for each machine, eliminating the overhead line shaft and flat belt arrangement, and employing a timing belt to provide a single reduction connection running directly from the grooved

2. Plaintiff's Exhibit 91, T. B. Wood's Sons Company Drawing No. 20045–B–1.

3. Plaintiff's Exhibit 10, Defendant's Exhibit 36, an article by R. E. Parker entitled "Electric Drives for Cotton Cards" on page 2 shows a picture of the method before the advent of the individual card drive and after.

pulley on the electric motor to a larger smooth peripheral surface pulley on the carding machine.

8. For the purpose of marketing the Gunter drive, Gunter & Cooke, Inc., the plaintiff Company, was organized in January, 1960, with $1,500.00 initial capital. The first year of operation, that is 1960, the sales volume was less than $25,000.00 and during the last full year of operation, that is 1964, the sales volume exceeded $750,000.00. Unit sales of Gunter drives for the years 1960–1964, inclusive, are as follows: 1960–93; 1961–544; 1962–1,460; 1963–1,928; 1964–2,595.

9. The Gunter drive employs a timing belt. The development of the timing belt started prior to 1945 and such belts had been in common use for many years prior to the application for the subject patent in 1960, and a book entitled "Timing Belt Drive Engineering Handbook," by Richard Y. Case, published by the McGraw-Hill Book Company, Inc., 1954, was on the market prior to the application.[4] A timing belt is unique in the respect that it has a toothed inner surface adapted to run on a pulley with teeth on it to mesh with the teeth on the belt. In such manner a gear-like function results whereby there is no slippage between the pulley and the belt. The toothed pulley is known as a timing pulley.

10. The Gunter patent in claim 1 provides for the use of a timing belt trained around a driving timing pulley and around a driven pulley with a smooth peripheral surface and additionally the use of a relatively small driving or timing pulley as compared with the smooth peripheral surface driven pulley.[5] The Gunter patent employs a combination of components so that a slipping clutch action of the belt is deliberately achieved during the starting period.

11. The "Timing Belt Drive Engineering Handbook," referred to in Finding No. 9 herein contains a section on page 25 thereof entitled "Grooved-to-Flat-Pulley Drives" and describes the operation of such drives as follows:

"High-ratio, flat belt drives, using a relatively small diameter pulley on the drive shaft, usually produce a considerable amount of slippage, resulting in low efficiency and reduced belt life. On such a drive the slippage may be overcome by fitting a Timing belt pulley to the drive shaft, replacing the flat belt by a Timing belt, and allowing the Timing belt to run over the large flat pulley. Such drives are entirely practical, many being in daily use, particularly in the textile field. Their advantages, in addition to preventing slippage on the small pulley, are twofold: since they eliminate the need for a large grooved pulley by using the existing flat pulley, the conversion cost is much lower; and, since slippage can take place on the flat pulley in the event of a jam or excessive overload, a degree of protection is provided.

" * * * As with a flat belt drive, initial tension is required to provide the necessary traction on the ungrooved pulley. * * * "

12. The Gunter drive as commercially produced conforms generally with the disclosure of the Gunter patent.

---

4. Defendant's Exhibit 16, copy of Handbook by Richard Y. Case.

5. Plaintiff's Exhibit 1, i. e., the patent in suit, claim 1 reads as follows:
"1. A drive for a machine having a relatively large driven pulley for actuating said machine at one end thereof, said driven pulley having a smooth peripheral belt-engaging surface; said drive comprising a bracket adjacent said pulley, an electric motor mounted on said bracket and having a relatively small driving pulley thereon in radial alignment with said driven pulley, an integral endless driving belt of flexible elastomeric material trained around said driving and driven pulleys, said belt and said driving pulley having interengaging transverse ribs so that said motor positively drives said belt without slippage and wherein only the crests of said ribs bear on said surface of said driven pulley whereby said belt may slip on only the smooth peripheral surface of said driven pulley, upon starting said machine, to smoothly accelerate said driven pulley with said electric motor running at substantially full speed."

The plaintiff contends that the inventive aspects of the Gunter patent are embodied in the following features: (1) An arrangement that reduces the space between the drive and driven pulleys; (2) A belt that is wide enough to provide sufficient contact on the driven pulley to give a clutch action; (3) An adjusting means to adjust the belt tension by which the clutching action can be set in a consistent and controlled manner. The Gunter patent does not specifically state the distance between the drive and driven pulleys nor the width of the belt and driven pulley. However, drawings of the Gunter patent do tend to illustrate without specifying distances that the pulleys are closely spaced.

13. Subject to the failure of the Gunter patent to give pulley and belt widths and center distances between the pulleys, the literal terms of the Gunter patent cover the accused Wood's timing card drive. The details of the Wood's timing card drive are as shown on the T. B. Wood's Sons Company drawing No. 20045-B-1. It is stipulated by the parties that the Wood's timing card drive components shipped to the Tabardrey Plant, Cone Mills Corporation, were adapted to be assembled to conform with the T. B. Wood's Sons Company drawing No. 20045-B-1, with the exception that the components did not include the larger driven pulley of the two pulleys shown on said drawing.[6] Both the Wood's timing card drive and the Gunter drive employ the small grooved motor or driving pulley with a timing belt trained over the smooth periphery of the conventional driven pulley of the carding machine. Further, both drives employ the principle of a considerably larger driven pulley than driving pulley with the pulleys positioned with short center distances and designed to accomplish a purposeful slipping clutch action. The only point of variance of any significance is the means by which the tension on the timing belt is adjusted and controlled. The Gunter drive incorporates an adjusting means by

having the plate on which the electric motor is mounted provided with a series of elongated slots in alignment with similar slots in the bracket to which the plate is attached. With such arrangement the motor can be linearly slid toward or from the axis of the driven pulley and clamped into position by bolts through the elongated slots. Further, as an adjusting means incorporated in the Gunter drive, a bolt is positioned through a rearward flange on the plate and extending into the bracket. The head of the bolt thus is positioned on the outer side of the rearward flange of the plate and a fixed collar is attached around the bolt on the inside of the rearward flange on the plate so as to leave the bolt rotable within the rearward flange. The bolt is threaded into the bracket and hence the bolt can be rotated, upon loosening the bolts in the elongated slots affixing the plate to the bracket, to effect a sliding adjustment of the plate on which the motor is mounted until the tension on the belt is at the desired tension.

For adjustment of the belt tension, the Wood's timing card drive employs an adjusting screw, operating in conjunction with a tension spring, that acts on the plate to which the motor is mounted and carries a locknut that serves to clamp the adjusting screw in place at the desired tension setting. Further, the plate in the accused Wood's timing card drive is mounted so that it pivots as the adjusting screw is rotated rather than linearly slid as is the case in adjusting the Gunter drive.

There are other slight variations between the two drives such as the Wood's timing card drive providing for the attachment of the motor on the inner face of the mounting plate rather than on the outer face as contemplated in the Gunter drive, and the mounting plate on the Gunter drive shields the belt a little more than the Wood's timing card drive, but the Court finds that there is no material or significant difference, function or purpose in the two drives.

6. Stipulation contained in Final Pre-Trial Order, August 12, 1965, Page 16, Stipulation 8.

14. The defendant promotes the sale of an alternative V-belt card drive arrangement manufactured also by the T. B. Wood's Sons Company. In this respect, there are two drives employing the V-belt that are accused of infringing the Gunter patent. One of such V-belt drives is known as the variable pitch sheave arrangement whereby the transverse grooved motor pulley on the drive using the timing belt is replaced with a pulley having adjustable flanges, which flanges by an adjustable screw arrangement can be brought closer together or drawn apart. Instead of the conventional timing belt, a V-belt is used. As the flanges are drawn together the belt rides higher on the flanges and thus a variable speed is obtained. The other V-belt arrangement substitutes the transverse grooved motor pulley on the drive using the timing belt with a V-grooved pulley containing multiple V-grooves for four or five V-belts. Other than the substitution of the pulleys and belts in the V-belt alternatives, there is no substantial or material difference between the V-belt alternatives and the Wood's timing card drive employing the timing belt and pulley.

15. In 1952 there was installed and put in use at Raylaine Worsted Mills, Manchester, New Hampshire, timing card drives. The electric motor was mounted on a base extending from the carding machine, which base was supported by a post extending from the floor. A 1200 RPM motor was used having a grooved or timing pulley on the shaft of the motor. A timing belt or belt with transverse ribs to mesh with the transverse grooves in the motor pulley was used. The driven pulley, that is, the pulley on the card machine was much larger in radius than the motor pulley and the face of the driven or card pulley was smooth. The timing belt employed had a steel cable member embedded in a neoprene covering and the teeth or transverse ribs had a slick nylon surface. During start up, the motor came to its normal full operating speed in a matter of a few seconds, but by reason of the slippage of the slick tooth surface on the smooth surface of the card pulley, the card pulley was not brought to its normal operating speed of 165 RPM for a much greater length of time. The effect of the slippage was that the card machine was brought slowly to its normal full running speed. On the Raylaine drive the motor mounting bolts were affixed through slots in the motor mounting base, and by sliding the motor forward or backward the belt tension could be adjusted and when the proper tension was secured the motor was locked into position by tightening the bolts. The drives at Raylaine were not concealed and visitors were allowed to see the machines in operation. The drives at Raylaine were used in commercial production from 1952 to 1955 when Raylaine Worsted Mills was liquidated and the machinery sold.

16. Articles entitled "Electric Drives for Cotton Cards" [7] and "A Simple Compact Cotton Card Drive," [8] both by R. E. Parker of the General Electric Engineering Department, published August, 1953, and September, 1953, respectively, describe the drives along with other drives at Raylaine. With reference to slippage, among other features described, the article entitled "Electric Drives for Cotton Cards" states on page 4 in the section headed "Cog Belt Drive," right hand column, that "Since there is belt slippage during acceleration the standard overload heaters are adequate for protecting the motors. * * * Also special overload relays may be desirable for complete motor protection in some cases where inherent belt slip during starting does not reduce the motor accelerating time sufficiently." From the evidence, it is concluded there was slippage on the driven or card pulley during the start-up period at Raylaine.

In July, 1960, a new and improved timing belt came on the market manufactured by the U. S. Rubber Co., which new

---

7. See Note 3, supra.

8. Plaintiff's Exhibit 89 and Defendant's Exhibit 67, "A Simple Compact Cotton Card Drive" by Parker.

belt was known as the "Hi-Last Construction." In this construction, the teeth of the belt are molded integrally with the body of the Neoprene belt, that is, the teeth of the belt and the back of the belt are both molded at the same time around the steel cable tensile member. The timing belt prior to 1960 had a serious tooth shear problem. The timing belt introduced in 1960 lasts many times longer than the prior timing belt. On the Gunter prototype drive installed on September 8, 1959, at the Edna Plant of the Cone Mills Corporation, Reidsville, North Carolina, the belt lasted approximately six months, but now the belts on the Gunter drive are guaranteed for three years. Sales of timing belts have increased substantially, and in 1965 there were approximately thirteen times as many timing belts sold as in 1952.

17. In early 1957 a drive employing a timing belt and driving pulley on a woolen card drive was installed in the Halifax, Virginia, plant of Pacific Mills. The card pulley or driven pulley was approximately 36 inches in diameter and was smooth, contrary to the motor pulley which had teeth. The motor got up to its full normal operating speed well ahead of the carding machine. The slippage gave the card machine a slow or soft start. The drive at Halifax was a test drive but there was no attempt to conceal the drive or secrecy surrounding its operation. Mr. Gunter saw the drive at Halifax, Virginia, as early as 1957 and was aware of its principle of operation. When the drive at Halifax was started, the belt would "squeal" and excessive belt wear was encountered.

18. In September or October of 1958, a woolen card drive employing a timing belt was installed at the Burlington Industries, Inc., Clarksville Plant, Clarksville, Virginia. After a period of testing, several more of the timing card drives were installed at the Clarksville Plant. These woolen carding machines were quite large and heavy and required a 10-horsepower motor to drive them. At first an attempt was made to drive these woolen carding machines with a plain or flat belt connection, but such was not successful because the flat belt slipped unduly on the motor pulley. At Clarksville, with the timing belt and timing driving pulley, upon starting the motor the motor would come up to its full normal operating speed within a matter of a few seconds, and it took approximately 45 to 50 seconds for the carding machine to come up to full speed. During the period that the carding machine was coming up to full speed, the timing belt would slip on the smooth surface of the card pulley; but by reason of the meshing of the teeth on the belt with the teeth on the motor pulley, there was no slippage on the motor pulley. The driven or card pulley was much larger in radius than the driving or motor pulley, and the two pulleys worked on short center distances. The motor for these drives was mounted on a plate on the floor and slid along the plate to adjust the belt tension. There was no secrecy surrounding the operation of these drives, and limited only by general plant policy, visitors, salesmen and others viewed the drives when in the plant.

19. The timing card drives at Halifax and Clarksville were adjusted for belt slippage on the surface of the smooth card pulley upon start-up. In the start-up period, the motor would come up to full speed within a few seconds and the card machine would attain its full speed in something less than sixty seconds. The belt tension on both the Halifax and Clarksville drives was adjusted by moving the motor forward or backward to secure the desired slippage on the card pulley. Mr. Gunter, in the course of his employment with Triangle Electric Motor Co., Durham, North Carolina, became familiar with the drives at both Halifax and Clarksville. On April 3, 1959, the date on which he states he conceived the invention, he visited the Clarksville Plant in the course of his employment with Triangle Electric Motor Co.

20. The timing card drives at Halifax and Clarksville were operated in regular commercial use more than one year prior to the time the application for the patent

in suit was filed, the filing of the application having been accomplished on the 19th day of September, 1960.

21. In December, 1958, at Langdale Mills, Langdale, Alabama, a cotton card drive was installed, employing a pancake motor mounted on a vertical plate with two V-sheaves on the motor shaft, and two V-belts running from the motor pulley to a flat driven pulley on the carding machine. The motor pulley had two grooves to cut down the slippage of the V-belts running on the motor pulley, and the radius of the card pulley was considerably larger than the radius of the motor pulley. On start-up the belts would slip on the smooth surface of the card pulley, and the motor would come up to its full normal running speed within a few seconds. The carding machine would come up to its full normal running speed in approximately fifty seconds after start-up. The electric motor was mounted so that the two pulleys, i. e., the motor pulley and card pulley, had short center distances. This drive and its operation was not clothed with secrecy and was in operation at Langdale at the time of the trial.

22. It is old in the art to have a motor mounted on the outer surface of a vertically installed flat plate with the plate serving as a guard for the motor pulley and belt.[9] In the specifications of the Gunter patent it is stated "An electric motor 26 is mounted on the outer face of the plat 18 and is a relatively flat type of motor presently available on the market." The flat type motor, commonly called "pancake" or "thinline" motors came on the market in approximately 1959.

23. Except for matters of degree, such as width, length, strength and slickness of the teeth, the belts used on the Raylaine drive, Halifax drive, Clarksville drive, accused drive of the defendant employing the timing belt and the commercially produced Gunter drive are the same. The belt used on the Gunter drive and accused drive is wider than the belt used on the other drives. The specifications of the Gunter patent, page 1, column 2, line 70, state "Drive pulleys and belts of the type described are well known in the art. * * *"

24. In December, 1959, Mr. Gunter supplied a trial drive to Ora Mills, Shelby, North Carolina. By letter of confirmation dated January 8, 1960, Ora Mills ordered forty-two more of the Gunter drives. The original drive furnished Ora Mills was designed so that the motor was to be located on the inside of the vertical plate (reference numeral 18 on the patent drawing), that is, the motor was to be located between the vertical plate and the cotton carding machine. Within a matter of a few days after receiving the trial drive, the installation and maintenance personnel of Ora Mills, in order to keep from having to extend the cylinder shaft on the carding machine, determined to mount the motor on the outside of the vertical plate with the motor shaft extending through the vertical plate toward the carding machine. In turning the motor around in such manner, the vertical plate then acted as a guard for the belt. There is conflicting evidence as to who conceived the idea of turning the motor around, but it is concluded by the Court after considering all the evidence that the weight of the evidence shows that this idea came from the mechanics at Ora Mills.

25. On September 8, 1959, a prototype of the Gunter drive was installed by Mr. Gunter at the Edna Plant of Cone Mills Corporation, Reidsville, North Carolina. The drive was installed for testing as to serviceability. This prototype drive was operated with the motor located on the inside of the vertical plate in the same manner as the Ora Mills trial drive. The drive at the Edna Plant was installed because they were having problems with their overhead drives. The application

9. Defendant's Exhibits 75 (Letters Patent No. 2,078,196, April 20, 1937, D. Heyer); Defendant's Exhibit 76 (Letters Patent 2,205,975, June 25, 1940, D. Heyer); Defendant's Exhibit 78 (Letters Patent No. 2,948,374, August 9, 1960, R. M. Husband).

**648**

for the Gunter patent was filed on September 19, 1960, and hence the prototype installation at the Edna Plant was slightly more than one year prior to the filing of the application. Mr. Gunter checked on this installation from time to time and used it as a means for determining belt life. The drive is still in use at the Edna Plant.

26. The publications, "Electric Drives for Cotton Cards," and "A Simple Compact Cotton Card Drive," describing the Raylaine drive, were not disclosed to the Patent Office nor was there a disclosure of the Halifax and Clarksville installations.

27. By reason of general economic growth, abandonment of the two-price cotton system and the allowance of fast depreciation on textile capital expenditures, among other things, in the last three years, there has been a substantial increase in the amount of money invested in equipment for textile plants.

28. Mr. Gunter was assisted in reducing his drive to practice by calculations furnished by B. W. Parsons, an engineer in the employment of T. B. Wood's Sons Company. It is concluded that Mr. Gunter utilized only the mechanical and constructive skill of Mr. Parsons to practically embody the Gunter drive.

29. The Court additionally makes those Findings of Fact which appear in the "Discussion" which follows.

### DISCUSSION

*Venue*

By the terms of the final pre-trial order, the parties stipulated that the Court has jurisdiction of the subject matter and of the parties, but the defendant contests the occurrence of an "act of infringement" within the Middle District of North Carolina to support venue as prescribed by 28 U.S.C.A. § 1400(b).[10] Under this section to support venue it must be established that the defendant has "a regular and established place of business" in the district where the suit is instituted and that the defendant has "committed acts of infringement" within such district.

It having been stipulated that the defendant has a "regular and established place of business" in this district, the question on venue is solely that of whether it is shown that the defendant committed "acts of infringement" in this district. The Court concludes that this issue must be answered in the affirmative. In arriving at this conclusion, as pointed out in plaintiff's brief, the issue of infringement is not reached on the merits in considering venue requirements.

It is contended by the defendant that the "acts of infringement" required to support venue must be acts of direct infringement, and that venue does not lie if the defendant only induced infringement under 35 U.S.C.A. § 271(b) or contributed to infringement under 35 U.S.C.A. § 271(c). There is substantial authority, with which this Court agrees, that the restricted view of the defendant as to venue is not sound. Leesona Corp. v. Cotwool Mfg. Corp., 201 F.Supp. 472, (W.D.S.C.1962); Dover Corp. v. Fisher Governor Co., 221 F.Supp. 716 (S.D. Texas 1963); Watsco v. Henry Valve Co., 232 F.Supp. 38 (S.D.N.Y.1964).

For venue purposes, "acts of infringement" are present when it is established that activities alleged to be infringing have taken place within the district where the suit is instituted, and the defendant has been directly involved in such activities.

From the facts heretofore found to the effect that the defendant has participated in the sale of the accused Wood's timing card drive in this district, it is concluded that venue is properly laid in this district in accordance with 28 U.S. C.A. § 1400(b).

---

10. 28 U.S.C.A. § 1400:
 (a) * * *
 (b) Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringment and has a regular and established place of business.

*Prior Art*

The plaintiff contends that the significant features of the Gunter patent are the following: First, the close spacing at which the drive motor pulley is positioned in relation to the large carding machine pulley that is driven; secondly, the proportioning of the belt width in relation to the width of the large pulley to be driven; and thirdly, the arrangment provided for adjusting the belt tension so that the intended slipping clutch action can be achieved during start-up. Stated another way, it is contended that the Gunter patent claims are combination claims describing a belt drive arrangement on shortcenters for wide surface contact so that it can be made to provide a slipping clutch action.

█ It is to be remembered that a claim for a combination patent must describe the crucial elements of the new combination in terms of its own physical arrangement and characteristics, and not just in terms of what the new combination will do. Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S. Ct. 6, 91 L.Ed. 3 (1946).

█ The articles "Electric Drives for Cotton Cards" by R. E. Parker, August, 1953, and "A Simple Compact Cotton Card Drive," by R. E. Parker in September, 1953, describe the Raylaine drive. In connection with the Raylaine drive, there are two separate defenses evident. First, the defense of prior publication, and secondly, the defense of prior knowledge or use. If the publications fully disclose the invention claimed or make it obvious to those skilled in the art, then the patent in suit is invalid.

Turning to the first claim in the patent in suit, the first element of the claim reads:

"A drive for a machine having a relatively large driven pulley for actuating said machine at one end thereof. * * *"

This element is not limited to any particular machine but only limited to a ma-chine with a driven pulley at one end. The photograph in the publication "Electric Drives for Cotton Cards," page 4, shows a big pulley at one end. Claim 1 continues:

"said driven pulley having a smooth peripheral belt engaging surface. * * *"

The aforementioned publication says on page 4, right hand column, "so teeth are not required on the large pulley" and the evidence discloses that at Raylaine the crown was machined off the large pulley. In any event, there is no evidence that the defendant has sold any of the large driven pulleys. The drives that went to Tabardrey were drive units absent the large driven pulley. Next claim 1 states:

"said drive comprising a bracket adjacent said pulley, and electric motor mounted on said bracket and having a relatively small driving pulley thereon in radial alignment with said driven pulley. * * *"

The drive at Raylaine had an electric motor mounted on the bracket, and the motor had a relatively small pulley on it. The motor pulley had to be in radial alignment with the large pulley or the belt would run off the large pulley. Passing to the next element in claim 1:

"an integral endless driving belt of flexible elastromeric material trained around said driving and driven pulleys. * * *"

The evidence is that the belts at Raylaine and the belt used on the accused device are those with the steel cable member around which the other components of the belt are molded. The belts do not stretch by reason of the steel cable member. The file wrapper in the patent in suit [11] shows that the Gunter application was rejected by the Examiner until the claim was amended to state that the belt to be used was one with "Elastomeric" qualities. The evidence on the other hand is that a belt that stretches will not work satisfactorily on the Gunter drive and that the commercial Gunter drive

11. Defendant's Exhibit 53, a copy of the file wrapper in Gunter patent.

uses the belt with the steel cable member. It is observed that the Elieson Patent, Patent No. 595,051 [12] used a steel chain device, with a fabric facing, running around the teeth on the driving pulley to a smooth driven pulley, and it appears to the Court that it was probably this belt, i. e., the Elieson belt, that the Patent Examiner thought a belt with a steel member to eliminate stretch would read upon. If the word "elastomeric" is readable on a belt with a steel cable member, and the Court so finds by reason of the apparent broad use of the word, then it is anticipated by the Raylaine drive.

Continuing with the next provision of claim 1:

"said belt and said driving pulley having interengaging transverse ribs so that said motor positively drives said belt without slippage. * * * "

Referring to the publication "Electric Drives for Cotton Cards" at the top of page 4, right hand column, it is stated "The small motor pulley has teeth on it to mesh with the belt teeth so the motor torque can be transmitted to the belt despite the small arc of contact. The length of contact with the large card pulley is great enough to transmit the torque by friction so teeth are not required on the large card pulley."

Next claim 1 reads:

"and wherein only the crests of said ribs bear on said surface of said driven pulley."

It is obvious from the publication that only the crests of the ribs or teeth on the belt of the drive there described would contact the smooth surface of the driven pulley on the card machine.

Reading the next portion of the claim, it says:

"Whereby said belt may slip on only the smooth peripheral surface of said driven pulley. * * .* "

The belt could not slip on the motor or driving pulley because the teeth on the belt and motor pulley mesh to make a positive drive. It is apparent in the Gunter drive and the drive described in the publication that the belt slippage, if any, had to take place on the driven or card pulley.

Continuing with claim 1:

"Upon starting said machine, to smoothly accelerate said driven pulley with said electric motor running at substantially full speed."

This portion of the claim says that the motor comes up to full speed first but the belt continues to slip. This feature is described in the publication "Electric Drives for Cotton Cards" as follows: (1) Page 4, left hand column, the bottom of the first full paragraph, reads: "Drives employing clutches or slipping belts which allow the motor to accelerate more rapidly than the card can use the standard overload relays." (2) Page 4, right hand column at the bottom thereof, reads: "Also special overload relays may be desirable for complete motor protection in some cases where the inherent belt slip during starting does not reduce the motor accelerating time sufficiently." It appears to the Court that the publication is in essence saying the same thing as claim 1. Slippage is inherent with a belt running on a smooth surface, and with the timing belt more so inasmuch as only the crest of the teeth contact the smooth pulley and thus more slippage will occur by reason of the relatively small contact surface. The more the belt slips on the smooth driven pulley the quicker the motor will accelerate to its full speed, which in effect is what the last three elements of Claim 1 of the Gunter patent says.

It appears to the Court, that claim 1 of the Gunter patent is fully covered by the publication, e. g., if one skilled in the art desired to construct a drive similar to that described in the Gunter patent, limited by the indefiniteness of the claims and specifications hereinafter discussed, he would have only to take the publication entitled "Electric Drives for Cotton Cards" by R. E. Parker, turn to page 4 and read the section entitled "Cog Belt Drive" plus the section beginning on page

12. Defendant's Exhibit 57, a copy of Elieson patent.

6 entitled "Electric Equipment for Cotton Card Drives." By reading page 4 he would determine, among other things, from the picture shown in figure 4 that he should use a standard 1½ h. p. motor. The Gunter drive employs a 1½ h. p. motor. The number of the motor is found on page 7 along with the dimensions. A timing or cog belt would be purchased upon putting the various components together along with the timing motor pulley, the belt upon start-up would slip. Of course, there would be necessary adjustments but mere adjustments are not invention.

Consequently, it is apparent that the claim is fully met by a printed publication.

The evidence is that at Raylaine several drives were installed, and they ran them for four years. The main difficulty encountered at Raylaine was tooth shear. By reason of this difficulty, a Mr. Spoerl, graduate of M.I.T. and a timing belt engineer, was called in. He stated that the timing belt of that period was inferior to the timing belt of today, and that he made an adjustment by moving the motor so as to tighten the belt and reduce the amount of slippage, and that after that no trouble of any substance was encountered. Later, timing belts were improved and the evidence is clear that tooth shear after the "Hi-Last Construction" is not a major problem.

 If there is a prior device that works, even though not refined, but discloses the principles, then any succeeding device is an anticipation of the principles disclosed by the prior device. The device does not have to be perfected, and if workable principles are published, it is an anticipation whether the device were ever built or not, if such publication appears over a year prior to the application for a

patent. 35 U.S.C. § 102(b) [13] says that a person shall be entitled to a patent unless the invention is patented or described in a printed publication in this or a foreign country or in use or on sale more than one year prior to the date of the application for patent.

It is apparent to the Court that claim 1 reads on the publication. There is no material difference in the drive described in the publication and the Gunter drive. It is contended that the adjusting means on the Gunter drive is different from the Raylaine drive, but the evidence discloses that the Raylaine drive was adjusted by moving the motor along its base and then locked in position by tightening the mounting bolts as the case in the Gunter drive. To assist in the adjustment of the belt tension by moving the motor, there is on the Gunter drive the rotable bolt attached to the rearward flange of the plate and described in Finding No. 13 herein, but the mere making of something which is known in the art to be adjustable does not amount to invention. The motor on the Raylaine device was a floor mounted motor but at that time the pancake or thinline motors were not on the market. After the more modern motors came on the market, they were designed so they could be mounted on a vertical plate. Hence it is elementary to then have the slots in a vertical plane to allow the motor to be moved forward or backward instead of having the slots in a horizontal plane as in the case of the floor mounted motor.

Claim 2 [14] of the Gunter patent follows the pattern of claim 1 and then adds a concluding claim setting out the motor mounting arrangement and means for adjusting the belt tension by sliding the plate to which the motor is attached along

13. 35 U.S.C.A. § 102. A person shall be entitled to a patent unless—
 (a) * * *
 (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or
 (c) * * *

14. Claim 2: "A drive for a machine having a relatively large driven pulley for actuating said machine at one end thereof, said driven pulley having a smooth

the guiding surface of the mounting bracket.

Claim 3 [15] also follows the general pattern of claim 1, and then adds a concluding claim emphasizing the belt-shrouding arrangement of the vertical motor mounting plate with respect to the large driven pulley.

Actually, the only difference in claim 2 and claim 1 is that it calls for the vertical plate. If you take a floor mounted motor and put it up on a vertical plate, claim 2 would read on it.

The last element of claim 2 reads "and means for clamping said plate and said guide surface in any selected position of adjustment." This element of claim 2 reads on the Raylaine drive as the motor mounting bolts were affixed through slots in the motor mounting base, and by sliding the motor forward or backward the belt tension could be adjusted and when the proper tension was secured the motor was locked in position by tightening the motor bolts in the slots.

█ If it were an improvement to substitute the pancake or thinline motor, i. e., the more modern motor, no patentable right arises for such improvement. In Todd v. Sears Roebuck & Co., 4 Cir., 216 F.2d 594 (1954), Judge Dobie writing for the court and quoting from Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008 (1938), said "and the improvement of one part of an old combination gives no right to claim that improvement in combination with other old parts which perform no new function in the combination * * *" Just to put the new motor on does not give rise to the right in claim 2 to claim all of the old parts shown in the Raylaine drive in combination with their new parts. If the new motor and plate arrangement effect an improvement, such could be the subject of a claim but not in combination

peripheral belt-engaging surface; said drive comprising a bracket adjacent said pulley, an electric motor mounted on said bracket and having a relatively small driving pulley thereon in radial alignment with said driven pulley, and integral nonmetallic driving belt trained around said driving and driven pulleys, said belt and said driving pulley having interengaging transverse ribs so that said motor positively drives said belt without slippage whereby said belt may slip on only the smooth peripheral surface of said driven pulley, upon starting said machine, to smoothly accelerate said driven pulley with said electric motor running at substantially full speed, an upright plate spaced outwardly of said end farther than said driven pulley, said electric motor being a relatively flat motor and mounted on the outer face of said plate, said motor having an output shaft extending inwardly through plate and said driving pulley being fixed to said shaft inwardly of said plate, said bracket having a guiding portion thereon a portion of said plate slidably abutting a guide surface on said guide portion, means for sliding said plate along said guide surface in a direction radially toward or from said driven pulley, and means for clamping said plate to said guide surface in any selected position of adjustment."

15. Claim 3: "A drive for a machine having a relatively large driven pulley for actuating said machine at one end thereof, said driven pulley having a smooth peripheral belt-engaging surface; said drive comprising a bracket adjacent said pulley, an electric motor mounted on said bracket and having a relatively small driving pulley thereon in radial alignment with said driven pulley, an integral nonmetallic driving belt trained around said driving and driven pulleys, said belt and said driving pulley having interengaging transverse ribs so that said motor positively drives said belt without slippage whereby said belt may slip on only the smooth peripheral surface of said driven pulley, upon starting said machine, to smoothly accelerate said driven pulley with said electric motor running at substantially full speed, an upright plate mounted on said bracket and spaced outwardly of said end farther than said driven pulley, said electric motor being a relatively flat motor and mounted on the outer face of said plate, said motor having an output shaft extending inwardly through said plate and said driving pulley being fixed to said shaft inwardly of said plate, said plate extending toward the axis of said driven pulley and past the periphery of said driven pulley a sufficient distance to serve as a guard for said belt at least to its points of tangency with said driven pulley."

with that which is disclosed in the prior art. This is known as an aggregation. Claims 2 and 3 are invalid claims by reason of the drives already in use more than one year prior to the Gunter application and more particularly by the publication, because the pre-existing drives and the publication show the basic combination that is spelled out in claims 2 and 3 to be old, and assuming the motor mounting arrangement, inclusive of the belt-shrowding feature of the mounting plate, to be improvements such is an improvement of one part of an old combination and the claims are aggregated, e. g., the fact that the vertical plate acts as a guard for the belt has no relationship or connection with slippage on the belt or the type belt used. If the motor mounting and belt guarding claims are invention then such must be claimed without bringing in claims covered by prior art. Todd v. Sears Roebuck & Co., supra; Heyl & Patterson v. McDowell Co., Inc., 4 Cir., 317 F.2d 719 (1963).

In arriving at the decision in this case, the Court is not unmindful of the fact that on April 3, 1959, the day Mr. Gunter states that he conceived his invention, he visited the plant of Burlington Industries, Inc., at Clarksville, Virginia, in the course of his employment with Triangle Electric Motor Co., where there was a drive being used employing a timing pulley with a belt slipping on a flat driven pulley.

The Gunter drive did not originally have the feature of the plate guarding the belt. Originally, the drive as constructed had the motor mounted between the vertical plate and the carding machine, but by reason of the necessity of extending the shaft on the conventional carding machine, the mechanics at Ora Mills in December of 1959 turned the motor around so as to have the motor mounted on the outside of the vertical mounting plate and thus the plate became a guard for the belt. There is conflicting evidence as to who conceived the idea of turning the motor around, Mr. Gunter or the mechanics at Ora Mills, but the Court, without intent to impugn the testimony of any witness, concludes that the greater weight of evidence shows that such idea came first to the mechanics at Ora Mills.

It is obvious that the early timing belts had a serious tooth shear problem, which was to a great extent overcome by the improved belt, referred to as the "Hi Last Construction" which came on the market in 1960. As a result of the improved belt, the sale of timing belts increased many times. Timing belts were on the market long before 1949. The Court is of the opinion and so concludes that the principles of the drive described in the Gunter patent were old but the marketing of a commercial embodiment of such drive had to await the development of a timing belt with sufficient durability to make the use of the drive economically feasible.

 The Court finds that the evidence conclusively shows that drives incorporating the principles of the drive described in the Gunter patent were in public use in regular commercial operation and had been described in printed publications more than one year prior to the date of the application for the patent. This is sufficient under 35 U.S.C.A. § 102(b) to invalidate the Gunter patent.

### Lack of Invention

In Heyl & Patterson v. McDowell Co., Inc., supra, Judge Bell, writing for the court stated "It is usually difficult to find true inventiveness in a combination patent."

 There were substantial advances in timing belts and pancake or thinline motors prior to September 19, 1960, making the drive described in the Gunter patent an acceptable commercial drive. To replace the old type belt with the more durable belt and the old type motor mounted on the floor with the more modern motor on a vertical plate does not constitute invention. It is not invention to substitute a modern material for other material. B. F. Goodrich Co. v. United States Rubber Co., 4 Cir., 244 F.2d 468 (1957); Pollard v. American Phenolic Corp., 4 Cir., 219 F.2d 360 (1955).

Neither is adjustability invention. In Kalamazoo Loose Leaf Binder Co. v. Wilson Jones Loose Leaf Co., 286 F. 715, 720 (S.D.N.Y.1920), Judge Learned Hand, then a District Judge, in a case involving a temporary binder to hold ledger sheets while being posted, in holding the patent invalid for lack of invention stated:

"It is not necessary to consider the metaphysical question whether the two form a 'combination' or an 'aggregation' * * * mere adjustability has often been held not patentable, and will seldom be such (citing cases). At most this adjustment was a matter of minor convenience, *attainable by many mechanical alternatives, none of which presented difficulty,* and all of which the claim covered. To succeed, it must depend upon the novelty of the bare idea of moving one or both side members. *It was an adaptation which might occur to anyone.* I cannot accept it as evidence of invention * * *" (Emphasis added)

For the plaintiff, Mr. Gunter testified with reference to the prior drives that "they had everything right there, if they had just put an adjusting means on there, and a wide belt, they would have had it." The plaintiff urges that controlled slippage is a component of the invention, but it appears to the Court that it would be obvious to one skilled in the art that the slippage of a given belt would depend upon the distance between the motor pulley and the machine pulley; e. g., if the pulleys were moved closer together, the tension on the belt would be lessened and there would be more slippage than if moved apart whereby the tension would be increased. Further, that it would be obvious to one skilled in the art that if a belt and pulley were widened a greater friction surface would be obtained, and that the smaller the motor pulley diameter the greater the area of contact by the belt on the peripheral surface of the driven pulley and consequently the greater the friction.

Mere mechanical skill is not invention. The distinction between mechanical skill and invention is whether what was produced was obvious to a person skilled in the art to which the subject matter pertains at the time the device was created. An underlying question always arises of whether the device is of sufficient magnitude to justify the extension of a monopoly to protect it. Helene Curtis Industries, Inc., v. Sales Affiliates, Inc., 2 Cir., 233 F.2d 148 (1956), cert. den. 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80. It appears that Mr. Gunter, through slight changes in the mechanical form of the previous drives, has developed a drive that is highly advantageous but mere changes in mechanical construction to eliminate known defects in previous devices does not make an improved device patentable. His work is simply "the more recent refinement of general progress in the art."

The record unequivocally shows that the plaintiff has had phenomenal success in the sale of the Gunter drive, but commercial success alone will not balance the scales in favor of invention, and is not of itself evidence of patentability but is to be considered where the question of invention is open to doubt. Walker on Patents, 2nd Edition, Volume I, § 87, page 498.

In Servo Corporation of America v. General Electric Company, 4 Cir., 337 F.2d 716 (1964), the court in holding the patent invalid for obviousness, citing Triumph Hosiery Mills, Inc., v. Alamance Industries, Inc., 4 Cir., 299 F.2d 793 (1962), cert. den. 370 U.S. 924, 82 S.Ct. 1566, 8 L.Ed.2d 504, and Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950), stated 337 F.2d at page 719:

"While the commercial success enjoyed by Servo's detector leaves no doubt that it has produced a useful device, commercial success cannot produce patentability where none existed before."

Rather than from invention, the Court concludes the success of the Gunter drive more properly is attributable to generally favorable business conditions in the textile industry over the last several years,

nurtured by legislation leading to substantial capital investments in the industry. Also, the impact of improvements in timing belts and electric motors cannot be overlooked, which improvements enabled the Gunter type drive to be utilized economically. Improvements in materials often make possible the marketing of some product or apparatus which previously, though known and understood, could not be marketed competitively. Furthermore, it is apparent to the Court that Mr. Gunter and his associates are knowledgeable in the machinery field; enjoy a good reputation in the industry and undoubtedly professionally and otherwise are fully capable of promoting the sale of their product in a competitive market. Management has much to do with success or failure.

■ Mr. Gunter knew of the drives at Clarksville and Halifax which employed the timing pulley and timing belt slipping on a smooth driven card pulley. It was the duty of Mr. Gunter to disclose these prior uses to the Patent Office as stated by the court in Triumph Hosiery Mills, Inc., v. Alamance Industries, 191 F.Supp. 652, 657 (M.D.N.C. 1961).[16] Also, the law charges the patentee with an acquaintance with all of the earlier developments of the art, and it is immaterial that he may not have actually known of the prior art. Foxboro Co. v. Taylor Instrument Co., 2 Cir., 157 F.2d 226, 233 (1946), cert. den. 329 U.S. 800, 67 S.Ct. 494, 91 L.Ed. 684 (1947).

In Heyl & Patterson v. McDowell Co., Inc., supra, the court called attention to the effect of failing to disclose prior art and stated as follows:

"The presumption of validity can be weakened or destroyed where there has been a failure to cite prior art before the patent examiner."

Admittedly, there was no disclosure to the Patent Office of the Clarksville and Halifax installations, and the evidence shows that the publications "Electric Drives for Cotton Cards," and "A Simple Compact Cotton Card Drive," relative to the Raylaine and other drives were not shown to the Patent Examiner.

■ A long line of cases hold that for a patent to be valid, its subject matter must display invention, ingenuity in excess of that of a skilled mechanic in the art, an innovation for which the public is indebted to the inventor. The Court concludes that the Gunter patent does not rise to the level of invention.

*Indefiniteness of Claim*

It is required by the provisions of 35 U.S.C.A. § 112 that the specifications contain a written description of the invention in exact terms so as to enable persons skilled in the art to make and use the same. There is nothing in the patent showing the width of the pulley, width of the belt or precise center distances between the pulleys. This is apparent even though it is contended by the plaintiff that the close spacing of the pulleys and proportioning of the belt width in relation to the width of the large driven pulley are significant features of the patent. With reference to definiteness of the patent, the court in United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232 (1942) said:

"The statutory requirement of particularity and distinctness in claims is met only *when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise.* A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field. Moreover, the claims must be reasonably clearcut to enable courts to determine whether novelty and invention are genuine * *

16. This case was affirmed by the Court of Appeals and is reported in 299 F.2d 793 (1962), cert. den. 370 U.S. 924, 82 S.Ct. 1566, 8 L.Ed.2d 504. Court of Appeals took different view of the evidence from that of trial judge about failure to disclose prior art.

Whether the vagueness of the claim has its source in the language employed or in the somewhat indeterminate character of the advance claimed to have been made in the art is not material. *An invention must be capable of accurate definition, and it must be accurately defined, to be patentable.* Cf. General Electric Co. v. Wabash Corp., supra, 304 U.S. [364] at pages 372, 373, 58 S.Ct. [899] at page 903, 82 L.Ed. 1402."

(Emphasis added)

The court in Rice v. Nash-Kelvinator Corp., 6 Cir., 150 F.2d 457, 460, (1945), held invalid a claim that described the function of the device instead of giving specific dimensions. It stated as follows:

"These portions of the claim describe not the structure, but the function or purpose to be achieved \* \* \* The patent describes certain results, but does not tell how they are obtained \* \* \*

"It is evident, therefore, that the patent does not inform a person skilled in the art as to the precise dimensions or the mathematical rules which must be applied in order to secure the results described. But this is fatal to the patent."

■ Patents, whether basic or improvements, must comply with the statutory requirements precisely and accurately. The inventor must inform the public of the limits of the monopoly during its life, so that the public may safely proceed without being unduly subjected to hazards of infringement. The particularity and distinctness in claims are met only when the claims clearly distinguish what is claimed from what existed before in the particular art and circumscribe what is to be precluded from enterprise during the life of the patent. The Court finds that the specifications and claims in the Gunter patent leave doubt as to the scope of the invention claimed. The diagrams admittedly clarify the claims and specifications somewhat but even so, leave unanswered the very vital dimensions of the belt, driven pulley and outer distances between the pulleys, which features the plaintiff says are significant. The Patent Office drawings cannot be relied upon for detail as they are not to scale. Toledo Scale Co. v. Barnes Scale Co., 18 F.2d 965 (E.D. Mich.1927).

■ The statutory requirement of particularity and distinctness has not been met in the Gunter patent.

*Infringement*

■■ If the Gunter patent is invalid, it is unnecessary to determine the issue of infringement for such issue is moot. Bobertz v. General Motors Corp., 6 Cir., 228 F.2d 94 (1955), cert. den. 352 U.S. 824, 77 S.Ct. 32, 1 L.Ed.2d 47 (1956). However, in view of the comprehensive testimony and exhibits adduced on the issue of infringement and probability of an appeal, and for the purpose of complete disposition of the case, the Court will decide the issue of infringement, assuming that it should be determined that the Gunter patent is valid.

■ In determining possible infringement the plaintiff must show that every essential element of the combination, or its equivalent, is embodied in the accused device. Absent such showing, infringement cannot be upheld. Entron of Maryland, Inc., v. Jerrold Electronics Corp., 4 Cir., 295 F.2d 670 (1961).

There are two V-belt drive arrangements that are accused of infringing the Gunter patent. One type employs a variable pitch sheave and a variable speed V-belt in place of the motor timing pulley and timing belt. The other type uses a multiple V-groove pulley employing four or five belts. Therefore, on both accused V-belt drives there is a different type belt and drive pulley from that disclosed in the Gunter patent. The V-belt arrangements do not use the principle of a driving pulley and belt "with inter-engaging transverse ribs." Otherwise, there is no difference in the V-belt drives and the accused drive employing the timing driven pulley and timing belt.

The Court finds that there is absent in the V-belt drives at least one essential element or its equivalent of the Gunter

claims, that is, the V-belt drives do not have a belt and driving pulley "having inter-engaging transverse ribs." Therefore, the Court concludes that the V-belt drives do not infringe the Gunter claims.

As to the accused drive which employs the timing motor pulley and timing belt,[17] when it is compared with the disclosure of the Gunter patent claims, there are some differences, but the Court concludes that the differences are insignificant functionally and structurally. First, the vertical motor mounting plate on the accused drive is arranged so that the drive motor may be attached on the inner face of the plate, rather than on the outer side as provided in claim 2 of the Gunter patent. Second, the accused drive has the vertical motor mounting plate attached pivotally for adjustment of the belt tension rather than linearly slidable as provided in claim 2 of the Gunter patent. Third, the accused drive employs an adjusting screw that acts on the vertical motor mounting plate through a positioning spring that serves to clamp the motor mounting plate at the desired setting instead of the means provided in claim 2 of the Gunter patent for clamping the motor mounting plate in position.

■ The foregoing differences when compared with the claims of the Gunter patent constitute immaterial differences. In any event, it is settled that infringement is not avoided simply by improvements. Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 921 (1935), cert. den. 298 U.S. 673, 56 S.Ct. 938, 80 L.Ed. 1395 (1936). The commercial embodiment of the Gunter patent and the accused timing motor pulley and timing belt drive incorporate virtually the same functions and purposes, and their variations are trivial and operate the same way, accomplishing the same result by substantially identical means. Therefore, assuming that the Gunter patent is valid, the Court finds that there is infringement as to this particular drive, exemplified by plaintiff's Exhibit 8.

## CONCLUSIONS OF LAW

In partial summary of the conclusions of law heretofore made and in addition thereto, it is specifically concluded that:

1. This is an action arising under the patent laws of the United States and the Court has jurisdiction of the subject matter by the terms of 28 U.S.C.A. § 1338(a).

2. Venue is properly laid in this District in accordance with 28 U.S.C.A. § 1400(b).

3. Claims 1, 2 and 3 are invalid for the reasons before stated.

4. If the Gunter patent is valid, then the accused Wood's timing card drive, exemplified by T. B. Wood's Sons Company Drawing No. 20045–B–1 (plaintiff's Exhibit 91), which drive employs the timing motor pulley and timing belt (Plaintiff's Exhibit 8) infringes the Gunter patent.

5. The prototype installation of the Gunter drive at the Edna Plant of Cone Mills Corporation, Reidsville, North Carolina, amounted to a testing use only and did not constitute a statutory prior use under 35 U.S.C.A. § 102(b).

6. B. W. Parsons is not a joint inventor of the Gunter drive with Josef K. Gunter.

The foregoing opinion incorporates those findings of fact and conclusions of law deemed necessary by the Court for the disposition of the case. However, counsel may, if they desire, within ten days of this date submit requests for further or more specific findings or conclusions in accordance with this decision.

Counsel may agree upon a form of order conforming with this opinion.

---

17. Plaintiff's Trial Exhibit 8 and 91.