Glen C. **BULL, Jr., Plaintiff,**

v.

**LOGETRONICS, INC., and Richard N. Johnson, Defendants.**

Civ. A. No. 4196.

United States District Court,
E. D. Virginia,
Alexandria Division.

Jan. 5, 1971.

James R. Sharp, Arnold B. Christen, George H. Mitchell, Jr., Washington, D. C., for plaintiff.

William A. Moncure, Alexandria, Va., William D. Hall, George E. McMurray, Jr., Kenneth L. King, Washington, D. C., for defendants.

## OPINION AND ORDER

KELLAM, District Judge.

This action and cross-action bring to the Court for determination contract and patent rights, a claim of conspiracy, alleged misappropriation of documents and information, and a claim of libel and slander.

The facts are presented through oral testimony, depositions, and numerous exhibits. Counsel have likewise filed exhaustive briefs.

The plaintiff, Glen C. Bull, Jr. (Bull), was for a number of years an employee of Haloid-Xerox Corporation (Xerox). That company was engaged, among other things, in the graphic arts business. Among its products it sold Foto-Flo-C machines, which were, in part, based on what is referred to as the Garraway patent. During the time of Bull's employment at Xerox, he obtained and assigned to Xerox patent 2,913,973 (973 and/or Bull patent), and a co-employee, Edward R. Sabel, obtained and assigned to Xerox patent 2,913,974 (974). Soon thereafter Xerox determined to devote the greater part of its energies toward the development of other products, and decided to dispose of all or some part of its graphic arts business. Up to that time it had sold and agreed to service a number of graphic and film processors based on the Bull and Sabel patents.

By agreement dated September 24, 1960, Bull obtained from Xerox an option to acquire its business of manufacture, sale and servicing of film processors, including the trademark "Lithoflo," the exclusive license under the Bull and Sabel patents (and eventually the patents themselves), another patent application, parts, et cetera. On or about July 24, 1961, Bull entered into an agreement (PX–2) with LogEtronics, Incorporated (LogEtronics), granting it an option to acquire all of Bull's rights under his agreement with Xerox dated September 24, 1960. On August 24th, 1961, LogEtronics exercised its option (PX–3) and confirmed the terms of the agreement of July 24, 1961 (set out in PX–2), conditioned upon Xerox agreeing to three amendments to the Xerox-Bull agreement of September 24, 1960 (PX–1). On that same day Bull assigned all of his rights under the September 24, 1960 agreement (PX–1) to LogEtronics (See PX–4). On that day LogEtronics (PX–5) advised Xerox it was assuming all of the rights and privileges and undertaking the contract responsibilities of Bull under the aforesaid contract. It forwarded a check for $50,000.00, representing the initial base royalty payment, and advised the exercise of the option was on condition of three modifications of the September 24, 1960 agreement, which it understood was agreeable to Xerox, namely, (a) LogEtronics would undertake the responsibility described in paragraph 13 of the contract in lieu of the performance bond therein called for, (b) it could purchase the inventory on a "pick and choose basis," rather than assuming the liability to purchase up to $100,000.00, and (c) the last sentence of paragraph 6 as shown on top of page 5 be amended to provide that "such unearned portion of such royalty will be applied as a credit against royalties due

in future years," but not to change the total price of $250,000.00. Xerox so agreed.

LogEtronics paid to Bull the $25,000.00 called for by the option of July 24, 1961.[1] A copy of the agreements of September 24, 1960, PX–1 and July 24, 1961, PX–2 are appended to this opinion.

Bull became an employee of LogEtronics about August 1961 and continued in its employ until January 1966. Following his separation from such employment, this action was filed. Subsequent to Bull's leaving LogEtronics in January 1966, Frank Steinhilper, then a vice-president of Xerox Corporation, assigned any claims which Xerox had or might have against LogEtronics (resulting from the September 1960 Bull-Xerox agreement) to Bull. The consideration for this assignment was an agreement by Bull to pay Xerox a portion of any recovery had in this litigation. Defendants question the authority of Steinhilper to make this assignment of the rights of Xerox.

In the able briefs filed by counsel, they enumerate the causes of actions and defenses substantially as follows:

*Plaintiff's Causes of Action:*—

1. Breach of contract for failure by LogEtronics to pay the royalties called for in the agreement of July 24, 1961, failure to exploit the licensed patent rights, and "certain other acts in violation of the responsibilities of the assignee" [LogEtronics].

2. Breach by LogEtronics of agreement to pay royalties called for by the exclusive licensing agreement between Xerox and LogEtronics dated August 24, 1961, which Xerox assigned to Bull.

3. For an alleged conspiracy between LogEtronics and Richard N. John-

---

1. The option agreement which was exercised required LogEtronics to pay certain royalties on the sales or rental of "Lithoflo or X-O-Flo apparatus embodying U. S. Patent numbers 2,913,973 and 2,913,974." The agreement further pro-

vided that if any claim of those patents was held invalid by decree of a court of competent jurisdiction, "the obligation of LogE to pay royalties in respect to such claim or claims shall terminate."

son (Johnson), President of Log-Etronics, to deny Bull the royalties to which he was entitled "under the Assignment Contract."

Plaintiff says this is not a patent infringement action and likewise he "is making no claim for any invention, design, trade secret, know-how, or the like, other than what is shown in patents '973 and '974."

*Counterclaims of Defendants:—*

4. LogEtronics asserts that Bull misappropriated certain of its documents and disclosed to other parties confidential information acquired while in its employ.

5. LogEtronics and Johnson assert claims for libel and slander against Bull for writings and words spoken.

6. Defendants assert that there exists a "constructive trust with respect to the money and rights, if any, received by Bull from Xerox in August 1966," because of Bull's use of information and confidential documents acquired as an employee of LogEtronics.

## DEFENSES

As to the three causes of action asserted by plaintiff, defendants say (a) that the '973 and '974 patents are invalid in view of the prior art; (b) neither of said "patents cover any LogE equipment;" (c) Bull does not own any rights in the PX–1 contract on which he is suing; (d) the actions of Xerox and Bull have destroyed the PX–1 agreement and rendered it unenforceable, and Bull's actions amount to "unclean hands;" and (e) there was no conspiracy.

Concerning the defendants' counterclaims, plaintiff says (a) it is not shown Bull removed the documents and/or information, or that it was confidential; and if so, he had a right to have and use the information; (b) that the alleged libel and slander was privileged, not actionable, and was without malice; and

(c) as to the alleged constructive trust, Bull acted within his rights, that he acted honestly, without fraud, and such action was in protection of his rights.

## GRAPHIC ARTS PROCESSING

Prior to the decade of the 1950's, graphic arts film as a general rule was processed by hand, using trays filled with emulsion and hanging the film up to dry. It was a tedious process. Automatic film processors were generally used only for X-ray film and motion picture film.

The Foto-Flo-C machine sold by Xerox as a result of the Garraway Reissue patent and some few others alleviated the problems of graphic arts processing to some extent. This machine suffered from the fact that although it was automatic (using an all-belt open-tray process), the film was occasionally damaged or scratched by the friction produced by the belts' rubbing against the film.

At the same time, the early automatic machines suffered from the fact that the emulsions used to process the film were thicker than those of today and tended to gum up the processors, making it necessary to shut down a processor in order to clean it. There were then several types of processors available, but they were not completely satisfactory. In recent years automatic film processors have become more popular because the film manufacturers have designed new type film with very hard emulsions which do not scratch and scar.

Sometime in the early 1950's, either Bull or one of his Foto-Flo-C customers, Chalis Hupp, concluded that if you substituted an idle roller section for one of the three belt sections of the Garraway Foto-Flo-C machines, damage or scratches to the film would be less frequent. (Which of the two first had this idea is a question which will be discussed later in this opinion.) Subsequent to this discovery, Bull or his superior in Rochester, New York, Sabel, had the idea that by placing a chain, similar in theory to a bicycle chain, on the

roller section (or sections) of the automatic processor, that graphic arts film could be driven through the processor in a more determined and steady or regular fashion, and thus eliminate some of the damage.

Illustration A appended to this opinion shows the drawings used by Bull during the prosecution of the patent. To explain the way in which the apparatus worked, first the film is placed on the tray 1 at the upper left with the emulsion side up. In '973, the film drops down between the V-shaped guides near the numeral 55, and moves down between the endless belt 93 (see Figure 2) and the series of rollers 25. Once the film has started its downward path it is carried along between the belts and the rollers at a predetermined rate of speed until it reaches the bottom of the tank, at which point it is reversed by a guide assembly 12, and it starts upwardly between the belts 93 and the rollers 25. Furthermore, there are tensioning bars 94, also referred to as "bail members," which push the belts 93 outward against the rollers 25. Each of the arms 94 is provided with a coil spring 95 (see Figure 1) which provides the tension to keep the belts 93 against the rollers 25 so that the film does not fall to the bottom on the upward portion of its journey through the '973 apparatus.

At this point it may be helpful to quote from the '973 patent itself as filed with the Patent Office in order to illustrate what aspects of the patent the applicants believed to be especially inventive:

This invention relates * * * particularly to improvements in conveyor systems for advancing photographic negative material through a treating fluid.

Heretofore a variety of processing machines have been proposed for the automatic processing of photographic film and/or paper. In a typical example of such a prior art device a plurality of endless-belt-carrying frames are immersed in a tank of photographic treating fluid and are arranged to convey the film or paper through the fluid during a predetermined processing cycle in order to complete the developing, fixing, or other treating steps that are to be effected. Specifically, in this arrangement each of the frames is provided with a plurality of endless belts actuated to move on the frames through the treating fluid in the tank and means for alternately guiding the material to be processed progressively between successive pairs of frames, and also includes tension rollers adapted to hold the endless belts on one frame in frictional contact with the endless belts on the adjacent frame, whereby the material to be treated is conveyed by the belts into and out of the treating fluid in the tank.

\* \* \* \* \* \*

Although the specific causes for * * * stretching of graphic arts material are not adequately understood it is believed that one cause may be pressure sensitization of the emulsion as it is gripped between belts on adjacent frames of the processing equipment.

Claim 9 of the '973 patent reads:

A conveyor for advancing photographic material into a tank of photographic processing fluid including a roller section having a plurality of vertically-aligned horizontally-positioned rollers, the uppermost roller of said section being arranged to be partly immersed in the processing fluid, an endless belt section arranged adjacent to said roller section, said endless belts comprising a plurality of vertically disposed endless belts extended around horizontally positioned shafts and resilient means for urging said belts into tangential contact with the rollers of the said roller section, driving means for rotating all rollers of the roller section in a common direction and for driving said endless belts in material feeding relation thereto, and means for guiding photographic material into tangen-

tial contact with the uppermost roller of the roller section.

## PRIOR ART

An early issue to be decided is whether LogEtronics may defend against the alleged breach of agreement to pay royalties on the ground of invalidity of the patent. In Scott Paper Company v. Marcalus Manufacturing Co., Inc., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1945), the Court held that the assignor of a patent is not estopped to defend a suit for infringement of the assigned patent on the ground that the alleged infringing device is that of a prior art expired patent. The Court said "[T]he assignor has a complete defense to an action for infringement where the alleged infringing device is that of an expired patent." [326 U.S. 258, 66 S.Ct. 105]. Thereafter in Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc., 339 U.S. 827, 836, 70 S.Ct. 894, 94 L.Ed. 1312 (1950), the Court invoked an estoppel to deny a licensee the right to prove that his licensor was demanding royalties for the use of an idea which was in reality a part of the public domain. In Lear, Inc. v. Adkins, 395 U.S. 653, 671, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), the Court overruled Hazeltine, supra, and held that Lear, the licensee of Adkins, "must be permitted to avoid the payment of all royalties accruing after Adkins' 1960 patent issued if Lear can prove patent invalidity." [395 U.S. 674, 89 S.Ct. 1913].[2] The Court further said that "federal law requires, that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent." [395 U.S. 668, 89 S.Ct. 1910].

Plaintiff contends the holding in Lear v. Adkins, supra, is limited, and "that it does not stand for the broad proposition that the buyer of a license to an already issued patent may repudiate his pur-chase contract almost at will" [plaintiff's opening brief p. 39]; and that in its broadest form, "it may indicate they can challenge the patents, although this is hard to sustain in light of the Lear facts." [Plaintiff's reply brief p. 3].

In Bendix Corporation v. Balax, Inc., 421 F.2d 809, 820 (7th Cir. 1970), in discussing the Lear case the Court said the Supreme Court held "that the licensee would not be required to pay royalties accruing before an adjudication of invalidity even though that is what the express contract of the parties provided." And in Product Engineering and Manufacturing, Inc. v. Barnes, 424 F.2d 42, 44 (10th Cir. 1970), the Court said that after Lear "there would seem to be no doubt about the right of a licensee to raise the issue of the validity and noninfringement of a patent as a defense in a State action to enforce payment of royalties." See also Painton & Co. v. Bourns, Inc., 309 F.Supp. 271, 273 (S.D. N.Y.1970).

■ It is clear from the above that LogEtronics may defend against the alleged breach of agreement to pay royalties on the ground of invalidity of the patent.

## VALIDITY OF BULL'S PATENT

In discussing the validity of the Bull patent we will look at the history of the prosecution of the application before the Patent Office to see what was novel about the patent and explore the patentability of the novel feature. We look to the novelty, utility, and obviousness, each of which must be satisfied. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545. There the Court said:

> While the ultimate question of patent validity is one of law, Great A. & P. Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. [147] at 155, 71 S.Ct. [127] at 131 [95 L.Ed. 162],

2. As to whether the Lear-Adkins decision is retroactive, the Court in footnote 19, 395 U.S. 674, 89 S.Ct. 1913, said "the public's interest in the elimination of specious patents would be significantly prejudiced if the retroactive effect of today's decision were limited in any way."

the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

And continuing at page 33, 86 S.Ct. at page 702, the Court said:

It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office. Hogg v. Emerson, 11 How. 587, 13 L. Ed. 824 (1850); Crawford v. Heysinger, 123 U.S. 589, 8 S.Ct. 399, 31 L.Ed. 269 (1887). Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent. Powers-Kennedy Contracting Co. v. Concrete Mixing & Conveying Co., 282 U.S. 175, 185–186, 51 S.Ct. 95, 99, 75 L.Ed. 278 (1930); Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 220–221, 312 U.S. 654, 61 S.Ct. 235, 239–240, 85 L.Ed. 132 (1940).[3]

In the history of the prosecution of the patent, Bull made it known that a variety of processing machines for the automatic processing of film had been proposed; that in the art, tension rollers adapted to hold endless belts on one frame in frictional contact with endless belts on an adjacent frame were in use; that endless belt sections could be substituted for idle roller sections, these rollers rotating only by frictional con-

tact through the material being processed. The tension bails are referred to as a part of the prior art. In the history of the patent, the application pointed out that tension rollers in devices of the kind in question were well known, including "tension rollers adapted to hold the endless belts on one frame in frictional contact with the endless belts on the adjacent frame." The Examiner rejected claims 1 through 10, inclusive, and 12 and 13 as unpatentable over Josepho British Patent No. 231,926 (Josepho British). In reply to the rejection, Bull's attorney said that although "Josepho discloses a conveyor apparatus for use in processing photographic material to obtain an end result comparable to that of applicants'" the Bull patent was distinguished over the Josepho British because of the "means for driving the rollers of both roller sections in a common direction and for driving said endless belts in material feeding relation thereto." Bull's attorney emphasized that "Josepho's driving means constitutes his belt whereby all of his rollers are frictionally driven. In contrast, applicants provide and define in the claims separate driving means for their rollers and for the belts." The history makes it clear that Bull recognized that "idle rollers" were a part of the prior art, and tension means for rotating the rollers was old, but he contended his machine was different because of the separate driving means for the rollers.

In determining whether the '973 and '974 patents are covered by the prior art, we look to the scope and content of the prior art, ascertain the difference between the prior art and the claims at issue, the level of the ordinary skill in the pertinent art, and the obviousness or nonobviousness of the subject matter. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545. Hence, here we are to determine whether the "driving means," the "conveyor system," the "resilient means" for urging the belts into tangential contact with the

3. Quoted with approval in Anderson's-Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 62, 90 S.Ct. 305, 24 L.Ed.2d 258 (1970).

rollers, the "pressure sensitization" of the patent are embodied in the prior art.

Defendants urge that U. S. Patent 1,656,522 issued January 17, 1928 to A. M. Josepho,[4] invalidates the 1959 Bull and Sabel patents. This patent was not cited by the U. S. Patent Office during the prosecution of the Bull patent. Defendants say the Josepho U. S. patent contains the two elements of the Bull patent urged as especially unique, namely, "driving means" and "resilient means."

The U. S. Josepho patent stated that the machine is "for strips or sheets of photographic film whether said film is of celluloid or paper or other flexible material, the term film being broadly used." An object of this patent is to keep the emulsion surface intact "without scratching or marring."

Referring to Illustration B (appended to this opinion) Figure 1, the film enters via chute 10, the film then goes downwardly and upwardly through each of the tanks 9 through 1, and then passes upwardly and outwardly through the drying mechanism 49–56. Each tank includes a transport system of the type shown in Figures 3 to 9 inclusive. It discloses five rollers 12, 12x, each mounted on a horizontal axis and located one above the other (Figure 4). Two belts 13 drive rollers 12, 12x, independently of the belts 14 and 15 which transport the film. This fact is essential in determining whether the Bull and Sabel patents are found in the prior art. As shown in Figure 9, belts 14 press upon the rear face of the film and force it into frictional contact with the roller 12x, without touching belt 13. There is a common drive means shown in Figure 3, which drives both the belts 13 (which drive the rollers 12) and the belts 14 and 15 in synchronism with each other.

As for resilient or tensioning means for pressing the belts against the rollers, the U. S. Josepho patent describes this aspect of the patent as follows:

The rollers 29 are mounted on shafts which project through slots formed in the side plates 17, and each shaft carries a small pulley 32. The two opposite pulleys 32 at each side plate are connected by tension belts 31 of rubber or the like which tend to move the said rollers 29 inwardly and thereby carry belts 14 and 15 toward the bevelled enlarged ends 12x of the feed rollers 12, so as to carry the film against the bevelled enlarged ends of said rollers.

As will be seen, the tensioning means comprises rollers 29 which are pulled toward each other by elastic bands. These rollers press the belts against the film or material to be processed, which in turn presses against the roller 12. In Bull there are tension bails which push the belt (54) towards the rollers. The Bull and U. S. Josepho patents have resilient means, such as a spring or tension member or the like, which presses the belt against the rollers which transport the film or material to be processed. Bull's patent mentions two outer roller sections and an inner belt section rather than an inner roller section and two outer belt sections, as in the U. S. Josepho patent. Is this inventive, or merely a well-known mechanical expedient? And does such a difference fall within the accepted rule for obviousness. I think so. There was ample evidence on this point by defendants' experts Montague and Russell and no contradiction by plaintiff's expert Jackson.

Claim 9 also provides for the uppermost roller of each roller section to be partly immersed in the processing fluid. Plaintiff did not stress the inventiveness of this aspect of the claim. Furthermore, there was ample testimony to the effect that the level of the processing fluid played little or no role in the effectiveness of the Lithoflo machine. These facts, coupled with the fact that the U. S. Josepho machine may be filled to any level desired—including the level whereby the top roller in the Josepho U. S. roller section is partly immersed by fluid—would be sufficient to find this

---

4. This patent expired January 17, 1945, and therefore became part of the public domain.

section of Claim 9 as embodied by the prior art, or in the alternative to lack sufficient inventiveness to be patented.

Claim 9 speaks of the driving of the endless belts in material feeding relation to the two roller sections. This aspect of the claim is covered not only by the U. S. Josepho patent, but by the Josepho British patent, No. 231,926; the Garraway Reissue patent, No. 22,654; and the Mayer U. S. patent, No. 2,404,138. The latter three patents were considered by the United States Patent Office during the prosecution of the Bull and Sabel patents. The "material feeding relation" aspect merely refers to the fact that the belt or roller section was driven—e. g. by a motor—in order to transport the graphic arts material in material feeding relation to other belts or rollers. As this aspect of claim 9 is embodied by the prior art, it cannot be considered to be patentable.

Claim 9 states that the Bull machine has a means for guiding photographic material into tangential contact with the uppermost roller of the roller section; however, this portion of the claim is very clearly covered by the U. S. Josepho patent in which Josepho's chute 10 performs this identical function.

Plaintiff contends that importance should be placed on the fact that the Bull machine comprises two, rather than one, section. This two-section aspect of the Bull patent was not expressly mentioned in any of the claims; however, it may be inferred from the patent specifications. The two-section aspect was not included by Bull as a novel feature of his invention at the time of one of his depositions. This omission could have very well been the result of Bull's presumed knowledge of the fact that the Josepho British machine utilized two sections rather than one. This fact was admitted by plaintiff's expert Jackson during the trial. It must be found that this particular feature is embodied by the prior art and as such is unpatentable.

Claims 10 and 11 of the '973 patent reiterate the substance of claim 9 in all but two respects. Claim 11 states that the rollers are "smooth-surfaced" and "cylindrical." The evidence showed that this type of roller was old and well known in the art and that a section of such rollers could have been easily substituted for the belt sections in the Josepho U. S. patent. The fact is that the Bull and Sabel patents never claimed any inventiveness as to the specific arrangement of the roller sections and the belt sections. If an invention is nothing more than a combination of old and well known elements, it is not patentable. Great A. & P. Tea Co. v. Supermarket Equipment Co, 340 U.S. 147, 152, 71 S. Ct. 127, 130, 95 L.Ed. 162. What was said in the last cited case is particularly applicable here, namely:

Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly.

The Court of Appeals and the respondent both lean heavily on evidence that this device filled a long-felt want and has enjoyed commercial success. But commercial success without invention will not make patentability. Toledo Pressed Steel Co. v. Standard Parts, Inc., *supra* [307 U.S. 350, 59 S. Ct. 897, 83 L.Ed. 1334]. [340 U.S. 152, 71 S.Ct. 130]

The Sabel patent reverses the Bull patent belt-roller arrangement, for in Sabel there are two belt sections on either side of a driven—rather than idler—roller section. The previous patents entered into evidence in this case cited by the U. S. Patent Office, Garraway, Josepho British, and particularly Mayer, are illustrative of the interchangeability of the belt and roller sections in this type of structure. The Hupp prior use, about which more will be written later in this opinion, is also illustrative of this interchangeability. It must be found that the provision for smooth-surfaced and cylindrical rollers in claim 11 is embodied by the prior art and as such is not patentable.

Claim 11 also states that the belts are driven at a peripheral speed equal to the peripheral speed of the rollers. In this respect the U. S. Josepho patent says:

> In order that the belts 13, 14, and 15 may be driven at the same rate of speed so as to prevent any rubbing action upon the film by the belts
> * * *

Josepho utilized the same theory that the Bull patent utilized in replacing idler rollers with rollers that were actually driven in order to minimize slipping and rubbing. The important difference here is that the Josepho machine utilized this theory thirty-one years before the Bull patent. The evidence shows that this feature of claim 11, which is to some extent related to the "material feeding relation" feature of claim 9, is embodied by the prior art and not patentable.

As for the other eight claims of the '973 patents, claims 1–5 are specifically limited to the use of two roller sections and one belt section with the drive means broadly defined. Claims 6–8 call for the rollers to have sprocket gears at the end, interconnected by an additional gear arrangement. These claims are clearly narrower than those of the broad claims 9, 10, and 11, and they offer nothing that need be considered patentable beyond what has been considered with regard to claims 9, 10, and 11.

■ Defendants' expert Montague, was unequivocal that any difference between Bull's '973 patent and Josepho U. S. 1,656,522 were immaterial. The drawings of Bull's patent show several belts (93), whereas Josepho has only two belts (14). Bull's claims say nothing about the width or the number of belts. Claim 9 says, "said endless belt section comprises a plurality of vertically disposed endless belts extended around horizontally positioned shafts." Josepho has two belts 14 (Figure 9) and two belts 15 (Figure 9). The two belts 14 constitute an endless belt section fully meeting the claim, and so do the two belts 15. Indeed, Jackson, on rebuttal, did not even attempt to distinguish Bull '973 over Josepho U. S.

■ As to the Sabel '974 patent, none of the claims are involved because the scrubber arrangement for the anti-halation coating on the back of the film, which was the claimed feature of the patent, was not used in the accused structures, the LD–24 and the L–31. Nevertheless, as the companion patent of the Bull '973 patent, it is found that the Sabel '974 patent should be considered as invalid as well.

There are only two differences in the wording of the claims of the two patents. First, '973, claim 1, says that the uppermost roller is submerged in fluid. Bull's attorney, on the other hand, admitted in the file wrapper that this was "not a necessary element of Applicant's invention." The other difference is that the '974 machine described the scrubber rollers. Each claim of '974, however, includes the other roller rack, the belt rack, the tensioning means, the means for driving the rollers and the belts, in essence all of the allegedly patentable features of the '973 patent. Such a situation is analogous to that found in Grinnell Corp. v. Va. Electric and Power Co., 277 F.Supp. 507, 524 (E.D.Va.1967), aff'd. 401 F.2d 451 (4th Cir. 1967). In Grinnell, as in the instant case, plaintiff was suing on two patents issued the same day. The second patent was an improvement in only one portion of the overall

device, yet it recited the entire combination of the first patent plus the allegedly novel feature constituting the alleged improvement. The Court in *Grinnell* held that under these circumstances that if the first patent was invalid the second one was also. We point out at the same time that just as in *Grinnell*, the second patent here could just as easily fail for obviousness. Furthermore, as an aggregation of old elements it does not meet the higher standard required for patentability. While the other aspects of '974 have been dismissed with regard to '973, the scrubber rolls of '974 are also found to be embodied by the prior art. In Lomax, U. S. Patent No. 1,346,662, issued in 1920, there is a belt 12 having scrubber rolls 27 cooperating with the belt " * * * serving to remove sediment as fast as it is loosened from the surface * * * " Testimony given by Dr. Russell supports the finding that scrubber rolls have been used for the purpose submitted by Sabel since the 1930's. The Sabel patent is invalid under 35 U.S.C. § 103 for obviousness.

Plaintiff asserts that the Bull and Sabel patents should not be found invalid because of the ability of the Lithoflo machine to handle all widths and thicknesses of graphic arts film. To begin with, this contention is not mentioned at all at any point in the file wrapper of either patent. It almost appears to have been asserted as an afterthought in light of the attack from the Josepho U. S. patent. This Josepho patent was never considered by the Patent Office. Under the facts, if any presumption of validity exists, it is very weak, as neither the Applicant nor the Examiner cited the pertinent Josepho U. S. patent. Heyl & Patterson, Inc. v. McDowell Co., 317 F. 2d 719, 722 (4th Cir. 1963). There the Court said:

> The presumption of validity can be weakened or destroyed where there has been a failure to cite prior art before the patent examiner.

See also, Blumcraft of Pittsburgh v. Citizens and Southern National Bank, 407 F.2d 557, 561 (4th Cir. 1969) ; Gunter & Cooke, Inc. v. Southern Electric Service Co., D.C., 256 F.Supp. 639, 655 (1966), aff'd. per curiam 378 F.2d 60 (4th Cir. 1967).

Some courts have held that the failure to cite a single pertinent prior art reference is sufficient to destroy the presumption, T. P. Laboratories Inc. v. Huge, 371 F.2d 231, 235 (CA 7, 1967); Monroe Auto Equipment Co. v. Superior Industries, Inc., 332 F.2d 473, 481 (CA 9, 1964); Dresser Industries, Inc. v. Smith-Blair, Inc., 322 F.2d 878, 888 (CA 9, 1963); Filmon Process Corp. v. Spell-Right Corp., 131 U.S.App.D.C. 374, 404 F.2d 1351, 1353 (1968). In such a situation it has been held the burden upon defendant to prove invalidity is by the mere "preponderance of the evidence," Lorenz v. F. W. Woolworth Co., 305 F.2d 102, 105 (CA 2, 1962); American Infra-Red Radiant Co. v. Lambert Industries, Inc., 360 F.2d 977, 989 (CA 8, 1966).

The fact is that while the Josepho machine can handle material of varying thicknesses, it can handle material with only a certain uniform width. The British Josepho machine, on the other hand, shows cylindrical rollers with a wide belt that can handle film of varying widths. Moreover, this machine could have been adjusted mechanically to have handled material of varying thicknesses as well. Plaintiff's expert Jackson testified that even in the accused LD–24 and L–31 structures there was a certain minimum thickness of .002 inch before the material could be used. This claim on the part of plaintiff does not have sufficient merit to frustrate a finding of invalidity of the two patents involved.

Plaintiff asserts that the tensioning means in the Josepho United States patent structure is too dissimilar in principle from that of the Bull structure to invalidate the Bull patent. Specifically, it is the contention of plaintiff that neither Josepho's rollers 12, 12x nor its belt 13 is ever in contact with the belts 14 and 15, and that for this reason the

Josepho structure should not be read on the Bull structure, so as to invalidate the Bull patent. Plaintiff's expert witness Jackson testified that the alleged "opening" (such that no contact is made) could at most be no more than several thousandths of an inch in width. Even if such were the actual situation it should be pointed out that in 1928 film was thicker than it generally is today, and filling the tanks with processing fluid will act to expand the thickness of the belts. It seems clear that the intention to have tangential contact here was present. Assuming Jackson to be correct, it would be a very simple and very obvious mechanical expedient to move the Josepho belt racks a few thousandths of an inch inward to make definite tangential contact with the rollers 12, 12x. There was, however, evidence that Jackson was incorrect in his assumption that there was no tangential contact. The specifications of the Josepho structure, while admittedly not to be used alone to determine the validity or the invalidity of a patent, clearly illustrate Josepho's intent that tangential contact should be provided for in his structure (Illustration B, Figure 4). The Josepho patent itself moreover calls for tangential contact. It reads:

> The two opposite pulleys 32 at each side plate are connected by tension belts 31 of rubber or the like which tend to move the said rollers 29 inwardly and thereby carry belts 14 and 15 toward the bevelled enlarged ends 12x of the feed rollers 12, so as to carry the film against the bevelled enlarged ends of said rollers.

"A combination of elements may result in an effect greater than the sum of the several effects taken separately," but does the combination of the old elements create a valid combination patent? Anderson's-Black Rock v. Pavement Salvage Co., *supra*. There the Court concluded "that to those skilled in the art the use of the old elements in combination was not an invention by the obvious-nonobvious standard." [396 U.S. 62, 90 S.Ct. 309]

## HUPP PRIOR USE

Defendants say that the invention claimed by Bull was not patentable because of public use of the same more than a year prior to time of application for the patent, and that neither Bull nor his joint applicants were responsible for the invention.

Title 35 U.S.C. §§ 102 and 103 in part provide:

§ 102. Conditions for patentability: novelty and loss of right to patent

A person shall be entitled to a patent unless—

\* \* \* \* \* \*

(b) the invention was patented or described in a printed publication in this or a foreign country or *in public use* or on sale in this country, *more than one year prior to the date of the application for patent in the United States,* or (Emphasis added)

\* \* \* \* \* \*

(f) he did not himself invent the subject sought to be patented, or

\* \* \* \* \* \*

§ 103. Conditions for patentability: nonobvious subject matter

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Chalis Hupp called as a witness by plaintiff testified that in 1952, having noticed that the belts of the Haloid-Xerox Foto-Flo-C machine (based on the Garraway three-belt section reissue patent) often left scratch marks on the face of the material being processed, he ordered a Foto-Flo-C machine from Mr. Bull and that he himself suggested a modification. Specifically, he ordered a machine where one of the belt racks was

substituted with a roller rack of idler rollers. The roller rack was adjacent to a belt rack containing belts which had tension arms to press the belts into contact with the rollers. This Hupp machine contained the elements of the Bull and Sabel patents. There were tensioning means to keep the film pressed against the idler roller rack. Furthermore, the ability to substitute an idler roller rack with a driven roller rack is clearly part of the prior art as the Josepho U. S. patent demonstrates with its driven roller rack.

Hupp used his machine for some two years. His use was open, obvious and apparent to his some eighteen employees, without any restriction or secrecy. The machine was used to print income tax forms, and blueprints were made for hundreds of different customers who were charged for same in the regular course of business.

In the "Inventionaire" form that Bull submitted to the Xerox Patent Department in 1955, Bull states that he had not conceived patent No. 2,913,973 until October 1, 1954, and further that no one outside the company had seen his invention. Hence anything as early as Hupp's 1953 use was not plaintiff's own concept. Moreover, Bull admitted that concurrently with the Hupp use, there was a similar installation in the hands of another Xerox customer. But, Bull now says the Hupp use was experimental and not public use.

■■■ Public use has been defined as "the practical employment in public of a complete or operative invention." Deller's, Walker on Patents, § 65, page 315. If public use is found, the patent which has been granted shall be invalid. It is a condition upon the inventor's right to a patent that he not exploit his discovery competitively after it is ready for patenting. "He must content himself with either secrecy, or legal monopoly." Metallizing Engineer Co. v. Kenyon Bearing & A. P. Co., 153 F.2d 516, 520 (2d Cir. 1946), cert. denied, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615. In the last cited case Judge Learned Hand, in speaking of prior use said:

It is true that for the limited period of two years he was allowed to do so, possibly in order to give him time to prepare an application; and even that has been recently cut down by half. But if it goes beyond that period of probation, he forfeits his right regardless of how little the public may have learned about the invention; just as he can forfeit it by too long concealment, even without exploiting the invention at all. Citing Woodbridge v. United States, 263 U.S. 50, 44 S.Ct. 45, 68 L.Ed. 159 (1923); Macbeth-Evans Glass Co. v. General Electric Co., 246 F. 695 (6th Cir. 1917).

The Supreme Court said in Electric Storage Battery Co. v. Shimadzu, 307 U. S. 5, 20, 59 S.Ct. 675, 684, 83 L.Ed. 1071 (1933):

The ordinary use of a machine or the practise of a process in a factory in the usual course of producing articles for commercial purposes is a public use.

See also Egbert v. Lippman, 104 U.S. 333, 336, 26 L.Ed. 755 (1881); Root v. Third Avenue R. Co., 146 U.S. 210, 223–227, 13 S.Ct. 100, 36 L.Ed. 946 (1892).

■■■ While the burden of proving a *prima facie* case of public use is upon defendants, once a use has been shown, the burden shifts to the plaintiff to prove, not by a mere preponderance of the evidence, but by clear and convincing evidence that the use was experimental and that any commercial use was only incidental to the experiment, Atlas v. Eastern Air Lines, Inc., 311 F.2d 156, 160 (CA 1, 1962):

However, once a prima facie demonstration of the claimed use has been made, the inventor carries the burden of showing that the use was not of a functionally operative device, or was substantially used for experimentation or testing purposes and this must be demonstrated by strong and convincing proof. National Biscuit Co. v. Crown Baking Co., 105 F.2d 422 (1st Cir. 1939).

While Bull attempts to describe the use as experimental, the facts do not support his explanation. As stated in the *Atlas* case, *supra*, (page 161):

> We do not believe that under the facts of the record the plaintiff's conclusionary description of the flight as "experimental" was sufficient to raise a genuine issue of material fact so as to forestall summary judgment.

See also Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 264–265, 8 S.Ct. 122, 130, 31 L.Ed. 141 (1887):

> He gives no account of the dates of any such experiments, nor any particulars respecting them. He does not say whether more than one mode of overcoming the difficulties experienced was suggested and tried or not; nor, if more than one device was attempted, what they were. The statements are meager and bald, and quite insufficient to satisfy us that the problem of perfecting the machine, in the particulars in which it was proved to be deficient, was one that was exercising the ingenuity and inventive faculty of the patentee continuously, with the ever-present intention, during the whole period, to make an application for the patents as soon as he had reached a satisfactory solution.

Too, the statute provides a patent must be applied for in the name of the true inventor [35 U.S.C.A. 102(b), supra]. Where one designs and another builds, the builder does not become the inventor. It was Hupp who in 1952 observed the belt marks and "requested through the Haloid Company—or Mr. Bull's office, that a roller rack be placed in this machine to try to eliminate those belt marks in the front rack."

Although Bull said he made changes following the Hupp use, the evidence does not demonstrate what changes were made or that they related to the portion of the machine which comprises the alleged invention.

## EMBODYING THE PATENT

Plaintiff's brief says that the assignment agreement, PX–2 "is not a patent license agreement; it is not a license agreement; it is merely an option agreement to purchase an assignment of the Exclusive License Agreement," that in effect, "the Assignment Agreement is in the nature of a contract for payment of a so-called finders' fee—in the form of royalties based on net sales." Plaintiff says that the term "embodying the patents" takes on a broader meaning than the term "covered by the claims." Plaintiff further says that the words "embodying the patents" includes everything disclosed in the patent. If plaintiff's interpretation is correct, then even where a patent was a combination of old elements, royalties would be due on each element of a prior expired patent. The use of the words "embodying the patent" could hardly have been so intended. Patents which have expired or which are invalid cannot be excluded from public use. The patent laws prohibit one from obtaining by contract any benefits by way of royalties on an expired or invalid patent. All the ideas of an expired or invalid patent are dedicated to the public. In Scott Paper Co. v. Marcalus Co., 326 U.S. 249, 256, 66 S.Ct. 101, 105, 90 L.Ed. 47, in speaking of the patent law, the Court said:

> They do not contemplate that anyone by contract or any form of private arrangement may withhold from the public the use of an invention for which the public has paid by its grant of a monopoly and which has been appropriated to the use of all. The rights in the invention are then no longer subject to private barter, sale, or waiver. Cf. Phillips Co. v. Grand Trunk R. Co., 236 U.S. 662, 35 S.Ct. 444, 59 L. Ed. 774; Midstate Horticultural Co. v. Pennsylvania R. Co., 320 U.S. 356, 361, 64 S.Ct. 128, 88 L.Ed. 96; Brooklyn Bank v. O'Neil, 324 U.S. 697, 704, 65 S.Ct. 895, 89 L.Ed. 1296. It follows that the patent laws preclude the petitioner assignee from invoking the doc-

trine of estoppel, as a means of continuing as against respondent, his assignor, the benefit of an expired monopoly, and they preclude the assignor from estopping himself from enjoying rights which it is the policy of the patent laws to free from all restrictions.

But, it does not appear from the use of the word "embodying" that it was intended it should be given any meaning out of the ordinary and there is nothing to indicate it was the intention to extend or permit a patent to be measured by other than the claims.

■ Since the Court has held the patents invalid, there is no reason to pursue further the words "embodying the claim."

## CONSPIRACY

Plaintiff contends that the two defendants conspired to deny him royalties to which he was entitled under the Bull-LogE agreement.

At the time of the Bull-LogE contract Xerox had sold some one hundred machines of the L20 and L31 type. About the same time Eastman-Kodak and Pako marketed competitive machines. The Eastman-Kodak and Pako machines became clear favorites over the Lithoflo L–20 machine. Lithoflo sold twenty-nine machines in 1962, whereas Pako and Eastman-Kodak together sold two machines. In 1964, Pako and Kodak sold thirty-four machines whereas LogE sold only six. Plaintiff's own witness, Benjamin, stated that the chain on his company's L–20 broke at least a dozen times within a period of six weeks. The one idea that Bull and his attorney had convinced the Patent Office was clearly inventive (as the U. S. Josepho patent was not cited) must not have seemed too clever to some of LogE's customers. With the qualitatively superior and less expensive Eastman-Kodak and Pako machines available, LogE would have been acting in a less than prudent commercial manner had it not attempted to design a machine that would more effectively compete with its competition. That plaintiff feels damaged as a result of LogE's research and development of the LD–24 may only be termed one of the exigencies of the technical, demanding, and highly competitive environment into which plaintiff had chosen to place himself. It should certainly not be termed conspiracy.

Plaintiff asserts that on many occasions he was denied corporate information which he had requested. He also asserts that the development of the LD–24 was without his knowledge and with the sole intent of circumventing his patents. The question of circumventing plaintiff's patents has been rendered moot from a practical point of view by the fact that the patents have been found invalid. The Bull-LogE agreement itself in paragraph (4) provides that no royalties shall be paid in this situation. Even beyond this consideration, there is not sufficient evidence that the patents were ever considered with regard to the development of the LD–24. What scanty evidence there is as to consideration of the patents—from Czarnikow—is far outweighed by ample evidence to the contrary and by showing the corporate dilemma in which LogE found itself at that time. Witness Knibiehly who was in charge of the LD–24 project testified that it was not the object of the development to circumvent royalties and that he had not discussed such a matter with anyone. Furthermore, the evidence makes it clear that it was imperative for LogE to develop a machine that was more marketable than the L–20 Lithoflo machine. The reason stated by Johnson for keeping the research work confidential was the corporate policy of not briefing the sales personnel on corporate research because of the tendency of the salesmen to tell their customers too much about a pending item before it had actually been released on the market. Bull was very much a salesman for the photo processing segment of LogE. It was through this medium that he earned his commissions. The fact that Bull was a salesman further explains why he

was not told of the development of the LD–24, and why he was not given free rein with the corporate files and documents.

 Briefly stated, a civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object; or a lawful object by unlawful or oppressive means. "To constitute a conspiracy there must be a combination of two or more persons; * * * a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy. 15 C.J.S. Conspiracy § 2, page 997." Neff v. World Publishing Co., 349 F.2d 235 (8th Cir. 1965). "So long as the parties seek only to further their own fair interest, they will not be liable for any merely incidental damage to another."

But where is the unlawful or oppressive object of any conspiracy in the actions and conduct of defendants, or any unlawful or oppressive means of obtaining a lawful object? None has been shown by credible evidence.

Then, where are the two or more persons who must conspire? In Vol. 16, Am.Jur.2d, page 151, par. 47, subject Conspiracy, the author in dealing with a civil conspiracy says, "that a corporation cannot be a party to a conspiracy consisting of the corporation and the persons engaged in the management, direction, and control of the corporate affairs, where the individuals are acting only for the corporation and not for any personal purpose of their own." [5] In Nelson Radio & Supply Co. v. Motorola, 200 F.2d 911, 914 (5th Cir. 1952), it was said:

> It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation. Here it is alleged that the conspiracy existed between the defendant corporation, its president, Calvin, its sales manager, Kelly, and its officers, employees, representatives and agents who have been actively engaged in the management, direction and control of the affairs and business of defendant. This is certainly a unique group of conspirators. The officers, agents and employees are not named as defendants and no explanation is given of their non-joinder. Nor is it alleged affirmatively, expressly, or otherwise, that these officers, agents, and employees were actuated by any motives personal to themselves. Obviously, they were acting only for the defendant corporation. * * * The defendant is a corporate person and as such it can act only through its officers and representatives. It has the right as a single manufacturer to select its customers and to refuse to sell its goods to anyone for any or no reason whatsoever. It does not violate the Act when it exercises its rights through its officers and agents, which is the only medium through which it can possibly act.

We think that in naming these officers, employees and agents as conspirators the plaintiff was mistakenly attempting to avail himself of the doctrine that what it would not be illegal for a corporation to do alone would be illegal as a conspiracy when done with another legally separate person or entity. However, as stated by Judge Chesnut in Arthur v. Kraft-Phenix Cheese Corporation, D.C., 26 F.Supp. 824, 830, "* * * the inclusion of the defendant's agents in the alleged conspiracy would seem to be only the basis for a technical rather than a substantial charge of conspiracy because obviously the agents were acting only for the defendant corporation."

Likewise, Zelinger v. Uvalde Rock Asphalt Co., 316 F.2d 47, 52 (10th Cir. 1963), held that a "corporation and its

5. Such is not necessarily the case in a criminal conspiracy.

employee do not constitute the 'two or more persons' required for a civil conspiracy. Other courts have also held that conspiracy cannot exist involving only a corporation and its officers or employees. E. g., Johnny Maddox Motor Co. v. Ford Motor Co., 202 F. Supp. 103 (W.D.Tex.1962); Tobman v. Cottage Woodcraft Shop, 194 F.Supp. 83 (S.D.Cal.1962); Bereswill v. Yablon, 6 N.Y.2d 301, 189 N.Y.S.2d 661, 160 N.E.2d 531.''

■ Even if it be conceded that a president and his corporation constitute the "two or more persons" required to form a civil conspiracy, the evidence in this case falls far short of establishing any conspiracy to do a wrong to Bull.

■ Clearly, a party to a contract involving a patent need not exploit the patent, whatever the contract may read, if the item covered by the patent is simply unmarketable. Eclipse Bicycle Co. v. Farrow, 199 U.S. 581, 26 S.Ct. 150, 50 L.Ed. 317 (1905).

## COUNTERCLAIMS

### Misappropriation of Documents

In the first of its counterclaims, defendant LogEtronics asserts that upon leaving its employment, plaintiff removed with him certain documents and subsequently disclosed the contents thereof to various parties to the damage of LogE.

Among other things, the defendant objects to the release of information contained in corporate documents such as: (1) financial statement of LogE for the period ending June 30, 1965; (2) letter from plaintiff's attorney to Xerox enclosing a cost analysis sheet of film processors; (3) reports to shareholders of LogE dated December, 1962, June 1963, December 31, 1963, August 3, 1964; (4) letter from plaintiff's attorney to Xerox reciting sales figures for Lithoflo machinery; (5) opinion of patent counsel, Colton, dated August 25, 1961 (DX–4) discussing Xerox patents.

In addition to setting up the above contentions as the foundation for recovery under a counterclaim, defendant asserted said actions and conduct of Bull as a defense to Bull's action for breach of contract, asserting Bull was in court with "unclean hands" which would bar his right of recovery. Because of what has been said above, we need not consider this issue as a defense, but only as a cross-claim.

Bull entered the employ of LogE in 1961 and continued until January 1966. During this time he acquired without permission of LogE certain reports, statements, and correspondence which he turned over to Xerox and other competitors of LogE. He passed along to Xerox information which he obtained by reason of his employment. He wrote letters and memoranda concerning the defendant company's activities and operations, and obtained advance information on the LD–24. He used and sought to have such information used for his benefit and the benefit of Xerox. It appeared the use of the information was vital to Xerox in reaching a decision on whether to bring action against LogE, and in making a sale and/or assignment of its alleged claim. It was used by Bull in obtaining an assignment from Xerox of a potential claim against LogE. It would serve no good purpose to attempt to here outline all of the uses made of such information, whether by Bull or others. It is clear uses were made to the harm of LogE. Much of the information was used while Bull was still employed by LogE. Many of his allegations seeking relief against LogE were the result of information obtained while in the employ of LogE. As a result of this information he sought to purchase any claim Xerox might have against LogE.

■ An employee is a fiduciary with respect to the information which comes to him in the course of his employment. He must exercise the utmost good faith, loyalty and honesty towards his employer [6] whether coupled with an

6. Vol. 3 Am.Jur.2d, subject Agency, page 580, par. 198; Community Counselling

Service v. Reilly, 317 F.2d 239 (4th Cir. 1963); Vol. 53 Am.Jur.2d, page 170,

interest or not, and whether the compensation is small or large.[7] The duty to be faithful does not cease when the employment ends. He has a duty not to reveal confidential information obtained through his employment, and not to use such confidential information after he has left his employment.[8] Even where the contract of employment does not prohibit an employee from engaging in competitive businesses after the termination of his employment, there is a restraint that he may not use "confidential information or trade secrets obtained from the former employer, appropriating, in effect, to his competitive advantage what rightfully belongs to his employer." *Community Counselling Service v. Reilly*, 317 F.2d 239, 244 (4th Cir. 1963). There the Court said:

> Employment as a sales representative demands of the employee the highest duty of loyalty. It is not without its difficulties when the employment continues after the employee has arrived at a fixed determination to leave his employment, for then his interests and those of his employer have lost their identity and may have become conflicting. Until the employment relationship is finally severed however, the employee must prefer the interests of his employer to his own. * * * Above all, he should be candid with his employer and should withhold no information which would be useful to the employer in the protection and promotion of its interests.

In Vol. 1A, page 492, par. 57, subject Agency, the author says that "any person who occupies a fiduciary relation to another is bound not to exercise to the benefit of himself and to the prejudice of the party to whom he stands in such relationship, any of the powers or rights, or any knowledge or advantage of any description, which he derives from such

confidential position." An employer has the right to expect loyalty from his employees so long as the employment continues, and the law implies an agreement on the part of the employee to faithfully serve. Vol. 53 Am.Jur.2d, page 170, par. 97, subject Master and Servant.

By order entered in this case on May 27, 1969, Judge Oren R. Lewis, directed that "all questions of liability will be heard first, and all questions of damages on both the claims and counterclaims will be reserved and deferred to a later proceeding, if liability is established." Hence we do not here deal with the issue of damages, only liability. Bull having misappropriated the documents of LogE, a hearing is necessary on the issue of damages.

■■■ Defendant LogEtronics is entitled to have returned to it by Bull any and all items hereafter set out, which are in his possession or subject to his control:

(a) Any and all correspondence or other items not written by or to him, properly addressed to him including copies thereof.

(b) Copies of financial reports of LogEtronics.

(c) Reports by officers or others in authority, other than Bull, to the stockholders of LogEtronics.

(d) Copies of opinion of patent counsel of LogEtronics dated on or about August 25, 1961.

(e) Cost analysis of LogEtronics of its film processor.

■■■ And Bull is enjoined and restrained from making use of any of such documents or the information learned therefrom for any purpose except as is required to conduct this litigation.

---

pars. 97 and 104, subject Master & Servant; Michie's Jur. Vol. 1A, page 492, par. 57, subject Agency.

7. Vol. 3 Am.Jur.2d, page 581, par. 199, subject Agency; Horne v. Holley, 167 Va. 234, 188 S.E. 169, 172.

8. Tlapek v. Chevron Oil Co., 407 F.2d 1129 (8th Cir. 1969); Anno. 165 A.L.R. 1453, 1454.

## CONSTRUCTIVE TRUST

Defendant LogE says that a constructive trust exists with reference "to the money and rights, if any, received by Bull from Xerox in August 1966," because of Bull's use of information and documents gained as an employee of LogE. It says that a constructive trust arose from the violation of some positive fiduciary obligation. Bull's conduct need not be fraudulent in order to establish that such a trust exists. Tlapek v. Chevron Oil Company, supra [407 F.2d 1133]. But this issue is so related to the issue raised in the cross-claim of misappropriation of documents and information, that the two will be combined in one issue, and await the presentation of evidence.

## LIBEL AND SLANDER

Lastly, defendants say that Bull issued a press release on August 26, 1966, the day after he filed this action, saying he had sued LogE and Johnson for a "conspiracy to defraud." The statement set forth that Bull, a former employee of LogE and an inventor, transferred to LogE his exclusive right to acquire the Xerox Corporation's Graphic Arts Film Processor business, had filed suit against LogE and Johnson for "royalty payments and damages in an amount over $1,000,000.00," and was "seeking punitive damages, alleging a conspiracy to circumvent the provisions of a contract relating to manufacture and sale of film processors under U. S. patents," the principal patent having been one obtained by Bull. Bull handed out such a press release to newspapers, trade papers and persons attending a trade show.

Defendants further asserted that in 1966 Bull told an employee of LogE that "Defendant's President was a 'crook.'"

In paragraph 17 of the complaint filed herein, Bull alleges that after LogE acquired the rights of Bull under the Xerox contract (contract of September 24, 1960 between Bull and Xerox) the defendant "Johnson conspired and acted with other officers * * * Board of Directors * * * stockholders and employees * * * to knowingly, willfully and deliberately render plaintiff's rights—valueless * * * and * * * deprive plaintiff of the major consideration for the assignment." The complaint alleges numerous acts done in furtherance of the conspiracy.

There are conspiracies civil and criminal. A civil conspiracy is defined above as a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means. Although a civil conspiracy may consist of concerted action to accomplish "an unlawful or oppressive object, or a lawful object by unlawful or oppressive means" the use of the word "unlawful" does not necessarily connote criminal. "Unlawful" means without authority of law; that which is not justified or warranted by law. It does not necessarily mean contrary to some statute or to the common law, but means "unauthorized by law;" it does not necessarily mean contrary to law, but means not authorized by law or the infringement of the moral law and not necessarily of the civil law. "The word 'unlawful' does not necessarily mean an illegal or criminal act. This word as used in the pleading involves acts, though not illegal, yet disapproved of by the law." Arlington Cemetery Corp. v. Hoffman, 216 Ga. 735, 119 S.E. 2d 696, 699. See also, People v. Wilson, 78 Cal.App.2d 108, 177 P.2d 567, 570; Pinder v. State, 27 Fla. 370, 8 So. 837, 840; State v. Chenault, 20 N.M. 181, 147 P. 283, 285; State v. Frazier, 54 Kan. 719, 39 P. 819, 821; State v. Savant, 115 La. 226, 38 So. 974, 975; Baton Rouge Bldg. Trades, etc. v. T. L. James & Co., 201 La. 749, 10 So.2d 606, 624. In Cortelyou v. Charles Eneu Johnson & Co., 2 Cir., 138 F. 110, at page 118, the Court says a patent may be infringed in either of three ways, unlawful use, unlawful making, or unlawful selling, and continuing:—

If, then, the owner of the patent has given to another the right to use one of the machines made under the patent in a particular way only, or with supplies necessary to its use of a

particular character or make only, the use of it in any other way, or with any other supplies or materials necessary to its operation, is necessarily a violation of the agreement, limitation, or license, and therefore unlawful. The word "unlawful" in this connection does not imply a criminal use of the machine or device, but a violation of the contract or agreement under which same is held and used. It follows that, by knowingly using a rotary neostyle made under this patent in question with ink other than that made and furnished by the Neostyle Company, the user violates the agreement and becomes a wrongdoer, and is "unlawfully using" the patented invention, * * *.

 The press release related to an allegation of the pleadings in the suit filed by Bull against the defendants. It constitutes a fair summary of the allegations in suit. One has a right to institute and prosecute an action without fear of being mulched in damages for reflections cast upon the defendants, otherwise civil actions would be far less likely to lead to correct results. Penick v. Ratcliffe, 149 Va. 618, 140 S.E. 664, Vol. 12 Michie's Jur. page 61, par. 19, subject Libel and Slander. The allegations were relevant to the issue involved, or charged, and when filed, became a public record, and therefore privileged. The privilege requires that the article be a fair and accurate account of the record. Times-Dispatch Pub. Co. v. Zoll, 148 Va. 850, 139 S.E. 505, Vol. 12 Michie's Jur. page 62, par. 19, subject Libel and Slander. The publication was a fair and accurate account of the issues in suit and no action lies from such publication.

The evidence establishes that in conversations with others Bull referred to defendant Johnson as "a crook." That is to say—(a) in September 1965 at a National Association of Photolithographers Show in Chicago Bull told Ira R. Kohlman, Director of the Graphic Arts Division of LogE that Richard N. Johnson was a crook. He said Johnson was trying to sell his patents (Bull's patents); that the stockholders of the company were unhappy with Johnson, would like to get him out, and he was trying to find a buyer for the company; (b) in 1965 Elizabeth Thompson, Sales Administrator of LogE heard Bull say that defendant Johnson was a crook; (c) sometime about 1965, Lee Augustine, President of Printing Machinery Company of Cincinnati encountered Bull at the Washington Airport and asked him "how things were going." Bull replied "[I]'m connected with a bunch of crooks." Nothing further was said. From the testimony given by Augustine it is not clear who Bull was thus referring to. That is, nothing in the evidence shows who or what he had reference to. The only conversation between the parties at that time is set out above.

 The incident in Chicago set out in (a) above is more troublesome. The circumstances under which the statement was made must be considered; "all the surrounding facts and circumstances must be taken into consideration, and the whole case must be looked at in the light of its own particular facts." Zayre of Virginia, Inc. v. Gowdy, 207 Va. 47, 147 S.E.2d 710, 713. On the occasion when Bull made the assertion to Kohlman, Bull displayed ill will against Johnson, asserting Johnson was trying to "sell his patents" (Bull's patents); that the stockholders of Johnson's company were unhappy with Johnson and would like to get him out; and that he (Bull) was trying to find a buyer for the company. It is apparent Bull was trying to get Johnson out as president of LogE and the evidence taken as a whole establishes Bull was the one who was anxious to get Johnson out, not the stockholders. No stockholder has come forward to say he wanted to get Johnson out as president, or that he was unhappy over Johnson's performance, nor has Bull named any stockholder who made such an assertion to him.

 Webster defines a "crook" as "a person given to crooked or fraudulent practices," a "swindler, thief, cheat."

To so charge the president of a company to the head of a large division of the company is slanderous. At common law defamatory words are actionable *per se* if they (a) "impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment," or (b) "prejudice such person in his or her profession or trade." Carwile v. Richmond Newspapers, 196 Va. 1, 82 S.E.2d 588, 591. See also Olinger v. American Savings and Loan Association, 133 U.S. App.D.C. 107, 409 F.2d 142, 144 (1969). And false and unauthorized spoken words which impute to a business or professional man "conduct which tends to injure him in his business or profession is libelous and actionable without allegations or proof of special damages." Carwile v. Richmond Newspapers, Inc., *supra*; James v. Haymes, 160 Va. 253, 168 S.E. 333.

Bull says the utterance was privileged, but whether "a particular utterance is a privileged communication depends upon the circumstances under which it is made." Alexandria Gazette Corp. v. West, 198 Va. 154, 93 S.E.2d 274, 281. The circumstances of the utterance are not shown by the evidence to make the utterance privileged. This issue will require further proceedings.

Within the meaning of Title 35 U.S. C.A. § 285, this is not a case that justifies the allowance of attorneys' fees to defendant, and accordingly fees to counsel for defendant are not allowed.

APPENDIX A

AGREEMENT

between

HALOID XEROX INC.

and

GLEN BULL

This instrument entered into this 24 day of September, 1960, by and between HALOID XEROX, INC., a corporation of the State of New York, having its principal office and place of business at Rochester, New York (hereinafter referred to as HALOID XEROX); and

GLEN C. BULL, 3 Chaminade Drive, Creve Coeur, Missouri (hereinafter referred to as BULL);

WITNESSETH:

WHEREAS, HALOID XEROX is presently engaged in the manufacture and sale of a graphic arts processor known as and bearing the trademark "LITHOFLO"; and

WHEREAS, HALOID XEROX is the owner of two United States Letters Patent: one issued to BULL, et al., No. 2,-913,973, and another issued to SABEL, et al., No. 2,913,974, covering said LITHOFLO machine; and

WHEREAS, HALOID XEROX holds certain rights under a patent application on an X-ray photo processing machine, filed by BULL in the United States Patent Office on November 23, 1959, Serial No. 35,101; and

WHEREAS, HALOID XEROX is the owner of Trademark Registration No. 668,351 covering the trademark LITHOFLO for use on said graphic arts processor; and

WHEREAS, HALOID XEROX is the exclusive licensee under United States Letters Patent issued to GARRAWAY, No. Re. 22,654; and

WHEREAS, HALOID XEROX is willing to withdraw from the manufacture, sale and service of said LITHOFLO machine and BULL is desirous of acquiring all rights to manufacture, service and sell said LITHOFLO machine;

NOW, THEREFORE, for and in consideration of the mutual covenants and promises set forth herein, the parties agree as follows:

DEFINITIONS

1. APPARATUS, PATENTS, APPLICATION, and PROCESSOR are defined as follows:

(a) APPARATUS is deemed to be equipment designed and intended primarily for the processing of transparent or other photosensitive materials for use in the graphic arts business as the term "graphic arts" is generally under-

stood within the photographic industry, as of the date of this agreement.

(b) PATENTS are deemed to mean United States Patent No. 2,913,973 and United States Patent No. 2,913,974.

(c) APPLICATION is deemed to mean the X-ray processor application filed in the United States Patent Office by BULL on November 23, 1959, Serial No. 35,101.

(d) PROCESSOR is deemed to mean the graphic arts processor presently manufactured and sold by HALOID XEROX under the trademark LITHOFLO.

## OPTION

2. In consideration of the sum of ONE THOUSAND DOLLARS paid by BULL to HALOID XEROX simultaneously with the execution of this Instrument, the receipt whereof is hereby acknowledged, HALOID XEROX hereby grants to BULL for the period of one year from the date of this instrument the sole and exclusive option to enter into the AGREEMENT set forth in this Instrument beginning with paragraph 6 hereof.

3. HALOID XEROX is the exclusive licensee under GARRAWAY Reissue Patent No. 22,654 which expires April 25, 1961. HALOID XEROX does not control the right to sublicense or assign the GARRAWAY patent but as part of the undertaking made in consideration of the ONE THOUSAND DOLLARS referred to above, HALOID XEROX agrees to cooperate in every reasonable way to enable BULL to obtain a license, under this patent, with right to sublicense, in the field of the APPARATUS and the APPLICATION as defined herein.

4. Also in consideration of the ONE THOUSAND DOLLARS hereinabove referred to, HALOID XEROX does hereby release to BULL any and all rights held under THE APPLICATION and the invention covered thereby.

5. BULL may exercise said option by notifying HALOID XEROX in writing within the period set forth in paragraph 2 hereof of his intention so to do, and by complying within thirty days thereafter with the terms and conditions set forth in the AGREEMENT. Subject to such compliance the date of the exercise of the option shall be for the purposes of the AGREEMENT be deemed to be the date of said written notice.

## AGREEMENT

6. BULL agrees to pay HALOID XEROX as follows:

(a) Either a lump sum payment of TWO HUNDRED FIFTY THOUSAND DOLLARS: or

(b) BULL agrees to pay to HALOID XEROX a royalty of 5% of the net sales by BULL of any product covered by the claims of the PATENTS. The product shall be deemed to be covered by the claims of PATENTS if the product or a part or a component thereof shall be covered by one or more claims of PATENTS.

In the event that BULL shall choose to pay HALOID XEROX pursuant to the provisions of subparagraph 6(b) above, BULL agrees to pay to HALOID XEROX minimum royalties according to the following schedule: FIFTY THOUSAND DOLLARS initial base royalty payable on exercise of the option as set forth in paragraphs 2 and 5 of this Instrument; and thereafter TWENTY-FIVE THOUSAND DOLLARS minimum royalty annually in advance, due on the anniversary date of the exercise of the option and on each anniversary date thereafter and payable within sixty days after each anniversary date. In the event that any minimum royalty paid is not earned in the year following such payment, such unearned portion of such royalty will be applied as a credit for royalties otherwise due over and above minimum royalty payments in future years.

7. Subject to the terms and conditions hereof, and upon payment of TWO

HUNDRED FIFTY THOUSAND DOLLARS to HALOID XEROX as provided for hereinabove in paragraph 6 HALOID XEROX does hereby agree to assign, sell, transfer and set over unto BULL its entire right, title and interest in and to PATENTS and the inventions thereof, to be held and enjoyed by BULL, his successors and assigns, or other legal representatives to the end of the term for which PATENTS are granted or may be extended, renewed or reissued as fully and entirely as the same would have been held and enjoyed by HALOID XEROX had this assignment not been made, and the entire right, title and interest in and to said trademark "LITHOFLO" Registration No. 668,351 thereon, together with the good will of the business connected with the use of this trademark.

8. If BULL shall elect to make periodic payments pursuant to subparagraph 6(b) above, HALOID XEROX hereby agrees to grant BULL, upon exercise of this option, a sole and exclusive license to make, use, lease, and sell, and sublicense others so to do, the inventions covered by the PATENTS. HALOID XEROX further agrees upon such exercise to grant to BULL an exclusive license in and to the trademark "LITHOFLO" including the right to sublicense others, subject to the nonexclusive rights granted HALOID XEROX in paragraph 14 hereinafter. Provided, however, that title to the PATENTS and trademark shall remain in HALOID XEROX until receipt by it within the five year period hereinafter set forth of the sum of TWO HUNDRED FIFTY THOUSAND DOLLARS.

9. In the event that BULL elects to pay HALOID XEROX under the provisions of paragraph 6(b) he may at any time within five years after the exercise of the option, upon payment to HALOID XEROX of an amount equal to the difference between TWO HUNDRED FIFTY THOUSAND DOLLARS and any royalties actually paid including the initial amount of FIFTY THOUSAND DOLLARS, terminate the obligation to pay royalties hereunder, and upon such payment HALOID XEROX agrees to make the assignments referred to in paragraph 7 hereinabove. HALOID XEROX shall not be obligated to make the assignments unless the said sum of TWO HUNDRED FIFTY THOUSAND DOLLARS shall have been received within said five years.

10. HALOID XEROX agrees that it will not assert against BULL any claims of patent infringement, if such claims:

(a) Would limit the right of BULL to make, use, and sell, and sublicense others to do so, the PROCESSOR.

(b) If such claims are based upon existing patents or pending applications in the field of this license or assignment, including the APPLICATION.

11. HALOID XEROX agrees to deliver to BULL such information and knowhow in its possession including engineering drawings, specifications, and all other pertinent data relating to the manufacture, maintenance and service of the PROCESSOR, which is reasonably necessary for the manufacture and sale of the PROCESSOR.

12. HALOID XEROX agrees to sell to BULL and BULL agrees to purchase at the price at which such items are carried on the books of HALOID XEROX, all jigs, dies, or other fixtures relating to the manufacture of the PROCESSOR and not needed by HALOID XEROX for its operations in fields other than the manufacture of the PROCESSOR and including all tanks, rollers and other assembled and unassembled parts of such PROCESSOR, including demonstrators in the warehouse or branch offices of HALOID XEROX, provided, however, that BULL shall not be obligated to purchase any of this equipment unless an inspection made by competent engineers shall disclose that it is in good and acceptable operating condition. In the event that upon analysis such total price shall be in excess of ONE HUNDRED THOUSAND DOLLARS, BULL shall not be obligated to make purchases exceeding the ONE HUNDRED THOUSAND DOLLARS amount, and BULL shall have the right to select

which of the items referred to in this paragraph 12 shall be included within the ONE HUNDRED THOUSAND DOLLARS limit hereinabove described.

13. Within ninety days of the exercise of the option BULL agrees to assume service responsibilities on existing PROCESSORS and BULL further agrees to post a FIFTY THOUSAND DOLLARS service performance bond in assurance of said service. Such bond will further protect HALOID XEROX against any loss incurred by HALOID XEROX in reasonably protecting its good will by undertaking the servicing of PROCESSORS which BULL shall have failed to service. Such undertaking shall be subject to the following limitations:

(a) No servicing obligation shall extend past a period ending two years from the date of the last sale made by HALOID XEROX of a PROCESSOR. HALOID XEROX agrees to notify BULL in writing the exact date of the last sale of a PROCESSOR.

(b) BULL shall not be obligated to undertake any servicing of PROCESSORS beyond the level of service maintained by HALOID XEROX on said PROCESSOR as of the date of this instrument and BULL shall be entitled to charge reasonable rates for such service and shall not discriminate between PROCESSORS sold by HALOID XEROX and PROCESSORS sold by BULL.

(c) If HALOID XEROX shall receive notice that BULL shall have failed to execute his obligations hereunder, BULL shall not be considered in default of his obligation pursuant to this paragraph 13 until thirty days after HALOID XEROX has given BULL written notice of the alleged default hereunder and BULL has failed within a reasonable period of time after receiving such notice to cure such default or to provide reason-able proof to HALOID XEROX that such complaint is unfounded.

14. BULL hereby grants to HALOID XEROX an irrevocable, nonexclusive, royalty-free, paid-up license under: a) PATENTS and b) APPLICATION and any patent issued thereon; c) any foreign patents equivalent to such PATENTS and APPLICATION, which may issue to BULL or his assignees, to manufacture, have manufactured for it, use and sell equipment covered by the claims thereof which are not included in the definition of the APPARATUS. This license to HALOID XEROX shall not include the right to sublicense, and shall be nonassignable except as appurtenant to a sale by HALOID XEROX of their complete business in the manufacture of equipment for the processing of silver halide photosensitive materials.

15. HALOID XEROX agrees to execute any and all of the documents necessary to perfect the transfer of the assets as set forth in paragraphs 4 and 7 hereof. HALOID XEROX further agrees, upon the request and at the expense of BULL, his successors and assigns, to require any officer or employee of HALOID XEROX to execute any and all reissue applications for the inventions covered in PATENTS. HALOID XEROX further agrees, upon the request of BULL, his successors and assigns, and at his expense, in the event of either of PATENTS or the trademark LITHO-FLO becoming involved in an interference or opposition, to cooperate to the best of the ability of HALOID XEROX with BULL, his successors and assigns, in the matter of preparing and executing any necessary documents, including but not limited to the preliminary statement required in a patent interference, and giving and procuring evidence in support thereof. Such commitment by HALOID XEROX shall include but is not confined to an undertaking to direct and require such persons as are officers or employees of HALOID XEROX to do and perform all things set forth in this paragraph. HALOID XEROX further agrees that this AGREEMENT covers

all rights under PATENTS and the trademark LITHOFLO in foreign countries and HALOID XEROX agrees upon the request of BULL, his successors and assigns, to execute any and all documents in connection with any and all applications for foreign letters patent or for foreign registration of said trademark LITHOFLO.

16. During the period of any license granted hereunder:

(a) BULL shall have the first option, by written request to HALOID XEROX, to direct and require HALOID XEROX to bring suit against any infringer or infringers of the PATENTS. Such suit shall be at BULL'S expense, under his control and for his benefit. Any damages recovered by judgment or settlement in such action shall be the property of BULL.

(b) HALOID XEROX may, at its option, notify BULL of its desire to have suit brought against any infringer or infringers of the PATENTS, and if BULL does not, within 60 days of receipt of such notice, indicate that he will undertake such suit as provided for in subparagraph (a) above, then HALOID XEROX may bring such suit in its own name, under its control, and for its benefit and at its expense. Any damages recovered by judgment or settlement in such action brought by HALOID XEROX shall be the property of HALOID XEROX. HALOID XEROX and BULL mutually agree to cooperate in the prosecution of litigation referred to above and in any litigation brought by BULL after assignment of the PATENTS.

17. Subject to the obligations of BULL set forth herein, including payment of royalties and minimum royalties, the license provided for herein shall continue for the life of PATENTS. Nothing contained in this paragraph 17, however, shall entitle HALOID XEROX to cancel any license hereunder because of (BULL'S) failure to meet his obligations pursuant to paragraph 13 above.

18. In the event that any claim or claims of PATENTS is held invalid by an unappealed and unappealable decree of any court of competent jurisdiction, the obligation of BULL under this license to pay royalties in respect of such claim or claims shall terminate.

19. Notices to either party required hereunder shall be mailed to the respective parties by certified mail.

20. HALOID XEROX shall have the right to terminate this AGREEMENT upon default in payment of any annual royalty payment. In the event of such default HALOID XEROX shall notify BULL of the default in payment and of its intention to terminate. Such termination shall take effect sixty days thereafter unless BULL shall first have paid the royalty in question.

21. HALOID XEROX agrees that it will not contest the validity of PATENTS, after assignment thereof or during the period of any license hereunder.

22. HALOID XEROX agrees to cooperate with BULL, and together with BULL the two mutually agree to use the normal publicity channels of HALOID XEROX in making an announcement to HALOID XEROX customers and to the general public of BULL'S successorship to the PROCESSOR business.

23. The parties hereto mutually agree to execute such other and further documents as may be necessary or reasonably convenient in the execution of the purposes set forth herein.

24. This AGREEMENT shall be binding on all the heirs, successors and assigns of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

HALOID XEROX INC.

By ————————————

ATTEST: ——————————

———————————————
Glen C. Bull, Jr.

APPENDIX B

AGREEMENT

THIS AGREEMENT entered into this 24th day of July, 1961, by and between

Glen C. Bull, 3 Chaminade Drive, Creve Coeur, Missouri, (hereinafter referred to as BULL), and LogEtronics, Inc., a corporation of the State of Delaware, having its principal office and place of business at Alexandria, Virginia, (hereinafter referred to as LogE).

### WITNESSETH:

WHEREAS, by agreement dated September 24, 1960, BULL owns an option to purchase certain property of HALOID XEROX, INC., including patents, patent applications, trade marks, jigs, dies and fixtures all relating to LITHOFLO and X–O–FLO machines; and

WHEREAS, LogE is desirous of acquiring all of the rights of BULL under, in and to the option held by BULL as aforesaid.

NOW, THEREFORE, for and in consideration of the mutual covenants and promises hereinafter set forth, the parties agree as follows:

### OPTION

1. BULL, in consideration of Twenty-Five Hundred Dollars ($2,500.00), in hand received and acknowledged, hereby grants to LogE for the period ending at 12 o'clock midnight, August 24, 1961, the sole and exclusive option to purchase an assignment from BULL of his entire right and interest in and to the BULL-HALOID agreement dated September 24, 1960, attached and made a part hereof, on the hereinafter expressed terms of agreement beginning with Paragraph 3 hereof.

2. LogE may exercise the option herein granted by giving written notice to BULL within the option period, and by complying, within thirty (30) days after date of such notice, with the terms and conditions set forth in the agreement beginning with Paragraph 3 hereof.

3. LogE agrees to pay to BULL:

a) Seven Thousand Five Hundred Dollars, $7,500.00 cash immediately and $10,000.00 on or before December 1, 1961;

b) Royalties in the amount of five (5%) percent per annum of all net sales or rentals of LITHOFLO or X–O–FLO apparatus embodying U. S. patent numbers 2,913,973 and 2,913,974, or any reissues thereof, exceeding Seven Hundred Fifty Thousand Dollars ($750,000.00) per annum for each of the first five (5) twelve (12) month periods after date of written notice provided in Paragraph 2 above;

c) Royalties in the amount of five (5%) percent per annum of the total net sales or rentals of LITHOFLO or X–O–FLO apparatus embodying U. S. patent numbers 2,913,973 and 2,913,974, or any reissues thereof, for each successive twelve (12) month period beginning with the sixth (6th) such period after date of notice provided in Paragraph 2 above until expiration of the latest patent referenced in the BULL-HALOID XEROX agreement, or any patent resulting from any application therein listed or any patent issuing on any invention specified for exception from BULL's contract with LogE at the time of his employment.

4. In the event that any claim or claims of those patents enumerated in Paragraphs 2 and 3 above is held invalid by an unappealed and unappealable decree of any court of competent jurisdiction, the obligation of LogE to pay royalties in respect of such claim or claims shall terminate.

5. This agreement shall be binding on and inure to the benefit of the heirs, successors and assigns of the parties hereto.

WITNESS the hands and seals of the parties hereto on the day and year first written above.

WITNESS:

Betty J. Hall

Glen C. Bull

LOGETRONICS, INC.
By Richard N. Johnson
President

ATTEST:
Robert C. North
Comptroller

ILLUSTRATION A

Nov. 24, 1959 G. C. BULL ET AL 2,913,973

PHOTOGRAPHIC MATERIAL CONVEYING APPARATUS

Filed Aug. 26, 1955

Fig.1

Fig.2

Fig.3

Fig.4

INVENTORS
GLEN C. BULL
LESLIE C. MARLEN
EDWARD R. SABEL

BY Frank... Stanwilson
ATTORNEY

[A3653]

Jan. 17, 1928.　　A. M. JOSEPHO　　1,656,522

DEVELOPING APPARATUS FOR PHOTOGRAPHIC FILM STRIPS

Filed March 12, 1925　　3 Sheets-Sheet 3

Fig.6.

Fig.7.

Fig.8.

Fig.5.　　Fig.4.　　Fig.3.

Fig.9.

INVENTOR
Arnold M. Josepho
BY H. Lee Nelson
ATTORNEY

Note the fluid comes up to here but can be regulated

[A3654]